## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN ADMIRALTY

CASE NO. 00-388-CIV-MOORE/SULLIVAN

AXA GLOBAL RISKS (UK) LTD.,

    Plaintiff,

vs.

FRANK PIERRE, JR., individually,

    Defendant.

_____/

FRANK PIERRE, JR. and YOLA PIERRE,

    Third-Party Plaintiffs,

vs.

DYER MARINE PROPERTY, INC., and
DWIGHT ANTHONY DYER, individually,

    Defendants.

_____/

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
### AND SUPPORTING MEMORANDUM OF LAW

The Plaintiff and Counterclaim-Defendant, AXA Global Risks (UK) Ltd., (hereinafter

"AXA"), by and through its undersigned counsel and pursuant to Rule 56 of the Federal Rules of

Civil Procedure and Local Rule 7.1, hereby files its Motion for Summary Judgment and supporting

Memorandum of Law, and respectfully moves the Court for entry of summary judgment in its favor

on the affirmative claims for declaratory relief filed by AXA and on the Counterclaim filed by

Defendant/ Counter-Plaintiff Frank Pierre, Jr. and Counter-Plaintiff Yola Pierre, and submits there

is no genuine issue as to any material fact and AXA is entitled to judgment as a matter of law, as

follows:

## I.   STATEMENT OF UNDISPUTED MATERIAL FACTS

1.   On July 13, 1999, the Defendant, Frank Pierre, Jr. submitted a Yacht Application for insurance for the vessel "*The Four Of Us.*" (Yacht Application attached as Exhibit "A"; Deposition of Frank Pierre, pp. 46-47, 64, attached as Exhibit "B"). Frank Pierre stated in his application that he was the operator of vessel, that the vessel was stored at his residence on Miami Beach, Florida and that he had no violations/suspensions (including auto) in the last five years, that he does not employ a paid crew, that he had not been involved in a marine loss in the last ten years and that he has not had his coverage declined, cancelled or non-renewed during the last five years. (Yacht Application, Exhibit A).

2.   Frank Pierre, Jr. signed the Yacht Application. (Deposition of Frank Pierre, pp. 46-47, 64, Exhibit B). Directly above Frank Pierre's signature, the application states:

### PLEASE READ BEFORE SIGNING

1.   This application will be incorporated in its entirety into any relevant policy of insurance where insurers have relied upon information contained herein.

2.   **Any misrepresentations in this application for insurance, will render insurance coverage null and void from inception. Please therefore check to make sure that all questions have been fully answered and that all facts material to your insurance have been disclosed, if necessary by a supplement to the application.**

(Yacht Application, p. 2, Exhibit A).

3.   Based on the Frank Pierre's Yacht Application, AXA issued Frank Pierre a policy of marine insurance providing certain marine hull and liability insurance coverage for the 39' Mainship powerboat known as the "*The Four Of Us.*" ( Policy No. 200/533/25177, attached hereto as Exhibit "C"). The policy was issued for a period of one year, expiring July 9, 2000. (Policy No. 200/533/25177, Exhibit C).

4.   The Cover Note for the subject Policy specifically reflects Frank Pierre's warranty

of no prior losses: "Special Warranties or Conditions: Warranted no known or reported losses as at

13th July, 1999." (Cover Note to Policy No. 200/533/25177, Exhibit C).

5.   The Policy states in Provision 9: General Conditions & Warranties:

(n) This contract is null and void in the event of non-disclosure or misrepresentation of a fact or circumstances material to our acceptance or continuance of this insurance. No action or inaction by us shall be deemed a waiver of this provision.

(Policy No. 200/533/25177, Exhibit C).

6.   On November 13, 1999, Frank Pierre reported the subject vessel stolen from a

location described as 96 Plaza De Lago, Islamorada, Florida sometime between November 7, 1999

and November 13, 1999. (Monroe County Offense-Incident Report dated 11/13/99, attached as

Exhibit "D"). As a result of the aforementioned theft, Frank Pierre made a claim under the subject

policy of marine insurance for the total loss of the vessel.

7.   In response to Frank Pierre's claim, the Plaintiff Underwriters investigated the

reported loss and discovered the following:

> a.   Contrary to the information provided by Frank Pierre on the Yacht Application (Exhibit A), the subject vessel at all times material hereto was not owned by Frank Pierre, but instead had been transferred five years earlier to Yola Pierre. (U.S. Coast Guard Certificate of Documentation, attached as Exhibit "E"; Application for Initial Issue, Exchange or Replacement of Certificate of Documentation attached as Exhibit "F," reflecting Yola Pierre as sole owner; Pierres' Third Party Complaint, ¶ 11; Deposition of Frank Pierre, Jr., pp. 16-17; 69, Exhibit B);
>
> b.   Contrary to the misleading information provided by Frank Pierre on the Yacht Application, the vessel was not being stored at Frank Pierre's residence in Miami Beach, Florida for approximately six months of each year, but rather was being stored at a location in Islamorada, Florida. (Monroe County Office-Incident Report, Exhibit D; Deposition of Frank Pierre, pp. 23, 67, Exhibit B);

      c.     Contrary to the information provided by Frank Pierre on the Yacht Application, he did employ a crew member for the navigation of his vessel (Deposition of Frank Pierre, pp. 58-59)[1];

      d.     Contrary to Frank Pierre's representation on the Yacht Application that he was not involved in a marine loss in the last ten years, AXA's investigation revealed that Frank Pierre had, in fact, filed two insurance claims as a result of prior marine losses, including a claim for the partial flooding of the vessel during Hurricane Georges in 1998 (resulting in suit against the preceding Underwriters), and a May 24, 1999 burglary of the subject vessel while moored behind Frank Pierre's house. (Miami Beach Police Offense-Incident Report attached as Exhibit "G"; Deposition of Frank Pierre, pp. 20-25; 26-29; 33-34; 43-44; 59-60); and

      e.     Contrary to the Frank Pierre's representation on the Yacht Application that he had not had any coverage declined, cancelled or non-renewed during the last five years, AXA's investigation revealed that previous Underwriters had refused to renew Frank Pierre's policy following his lawsuit against them for hurricane damage to the vessel. (Deposition of Frank Pierre, pp. 47; 61-62; Letter of Non-Renewal dated 5/31/99 from Seacoast Marine Ins., attached as Exhibit "H");

8.     The Yacht Application expressly states, "any misrepresentation in this application

for insurance, will render insurance coverage null and void from inception." (Yacht Application,

Exhibit A).

9.     The accepting Underwriter confirmed he never would have accepted the risk and

never would have agreed to underwrite the subject policy had he been informed by Frank Pierre of

the prior marine losses (and resulting litigation) and/or had he been informed that the preceding

policy was non-renewed. (Affidavit of B.A. Usher, attached as Exhibit "I"). Moreover,

---

[1] Although Frank Pierre denied maintaining a paid crew on the vessel, he admitted to compensating guides for navigating the vessel and helping the passengers fish. (Deposition of Frank Pierre, Jr., pp. 23-24; 58-59).

Underwriters would not have issued the policy to Frank Pierre for a vessel owned by his wife. (Affidavit of B.A. Usher, Exhibit I). Frank Pierre's misrepresentations on the Yacht Application were directly material to the risk and, if the information had been disclosed, AXA would have declined to accept the risk. (Affidavit of B. A. Usher, Exhibit I).

10.     In light of the foregoing, AXA respectfully submits that the subject policy of marine insurance is rendered void from its inception due to Frank Pierre's material misrepresentations and/or omissions of material fact in the application for insurance and, therefore, AXA's obligation to Frank Pierre, by and through the policy of marine insurance and in connection with the referenced loss, did not arise.

## II.    ARGUMENT

### I.     THE POLICY IS VOID *AB INITIO* DUE TO FRANK PIERRE'S MATERIAL MISREPRESENTATIONS IN THE MARINE INSURANCE APPLICATION.

The Eleventh Circuit adopted the firmly entrenched marine insurance doctrine of *uberrimae fidei* is well-entrenched in the Eleventh Circuit.[2] *HIH Marine Services, Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000) (finding material misrepresentations voided policy and granting summary judgment for insurer in declaratory judgment action); *Steelmet, Inc. v. Caribe Towing Corp.*, 747 F.2d 689, 695 (11th Cir. 1984). The doctrine of *uberrimae fidei* requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk. *HIH Marine*, 211 F.3d at 1362; *Steelmet*, 747 F.2d at 695. Under the doctrine of *uberrimae fidei*, a policy is deemed void from its inception if the insurance policy was issued based on the insured's

---

[2] As an entrenched rule of maritime law, the doctrine of *uberrimae fidei* controls and supercedes any state law on this issue of marine insurance. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 75 S. Ct. 368 (1955); *see also ABB Power T & D Co , Inc v. Gothaer Versicherungsbank Vvag*, 939 F.Supp. 1568, 1575-78 (S.D. Fla. 1996) (detailing precedential history of opinions determining whether state or maritime law governs marine insurance disputes).

material misrepresentation. *HIH Marine*, 211 F.3d at 1362; *see also, Certain Underwriters at Lloyd's London v. Giroire*, 27 F.Supp.2d 1306, 1312 (S.D. Fla. 1998). The Eleventh Circuit articulated the policy behind the *doctrine of uberrimae fidei*, as follows:

> The central principle of *uberrimae fidei*, however, is that the *insured* bears the burden of full and voluntary disclosure of facts material to the decision to insure. This duty to disclose is based on the rationale that requiring the marine insurer to investigate each and every claim made by those applying for coverage "would be both time consuming and expensive." (citation omitted). Instead, the law has placed the burden of good faith disclosure with the person in the best position to know all the facts: the insured.

*HIH Marine*, 211 F.3d at 1363, *citing Northfield Ins. Co.*, 983 F.Supp. at 1383.

The duty to disclose extends to those material facts not directly inquired into by the insurer. *HIH Marine*, 211 F.3d 1362-64; *see also Jackson v. Leads Diamond Corp.*, 767 F.Supp. 268, 271 (S.D.Fla. 1991). An applicant for marine insurance is bound to reveal every fact within his knowledge that is material to the risk, irrespective of whether the information is requested by the application. *Cigna Property & Cas. Ins. Co., v. Polaris Pictures Corp.*, 159 F.3d 412, 420 (9th Cir. 1998).

Under *uberrimae fidei*, a material misrepresentation on an application for marine insurance is grounds for voiding the policy. *HIH Marine*, 211 F.3d at 1363; *Steelmet*, 747 F.2d at 695. Even if the insured's failure to disclose was due to negligence, mistake, accident or voluntary ignorance, the policy never attaches and is void. *Steelmet*, 747 F.2d at 695; *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 980 (5th Cir. 1969).

The language of the application is consistent with the doctrine of *uberrimae fidei* and demonstrates the parties' intent for the obligations of the doctrine to apply to this insurance transaction. *Giroire*, 27 F.Supp.2d at 1312. The application specifically instructs the applicant that

any misrepresentations in the application will render the insurance coverage void from its inception, and requests that the applicant to disclose all facts material to the insurance. (Yacht Application, p. 2, Exhibit A). Frank Pierre concedes he signed the application immediately under the referenced language on the application. (Deposition of Frank Pierre, pp. 46-47; 64). Therefore, as a matter of law and pursuant to the application signed by Frank Pierre, Frank Pierre owed the duty of utmost good faith to furnish AXA with any and all information material to the risk of insuring *The Four of Us*.

## A. Violating his duty under *uberrimae fidei*, Frank Pierre misrepresented the facts on his application for insurance.

The undisputed facts demonstrate Frank Pierre's application for insurance includes several material misrepresentations. Specifically, Frank Pierre's Application for Insurance misrepresented the following facts by denying or misrepresenting information as follows:

(1) The Defendant's marine loss history: Despite his representations on the application, Frank Pierre had incurred two prior marine loss claims within the nine months preceding his application. (Deposition of Frank Pierre, pp. 32-33, 43, 60, Exhibit B);

(2) The true owner of the vessel: Frank Pierre transferred ownership interest from himself to his wife, Yola Pierre, for the specific purpose of ensuring the vessel is not considered his asset. (Deposition of Frank Pierre, Jr., pp. 16-17, 69, Exhibit B; U.S.C.G. Certificate of Documentation, Exhibit E; Application for Initial Issue, Exhibit F; Pierres' Third Party Complaint, ¶ 11).

(3) The actual location where the vessel would be moored: Although Frank Pierre had represented to underwriters that the vessel would be moored at his residence in Miami Beach, he actually maintained the vessel in the Florida Keys for five to six months of each year. (Deposition of Frank Pierre, p. 23, Exhibit B);

(4) Paid crew members: Frank Pierre concedes he compensated "guides" who assisted with the vessel's navigation and the passengers' fishing. (Deposition of Frank Pierre, pp. 23-24; 58-59, Exhibit B); and

(5) Non-renewal of coverage during the last five years: Frank Pierre completed the subject application for insurance because his prior Underwriters refused to renew his policy following a lawsuit he filed against them (on one of the undisclosed prior losses). (Deposition of Frank Pierre, pp. 47; 61-62. Exhibit B; Letter of Non-Renewal dated 5/31/99 from Seacoast Marine Insurance, Exhibit H);

The undisputed evidence supports the vast disparities between the information provided on the Application and the information discovered by AXA subsequent to the claimed loss. Each of the omitted or misrepresented facts were known to Frank Pierre. Frank Pierre, the individual with most knowledge as to the requested facts, failed to exercise the utmost good faith in disclosing to the Plaintiff Underwriters all facts material to the risk.

## B.     Frank Pierre's misrepresentations were material to the risk.

A misrepresentation is material if "it might have a bearing on the risk to be assumed by the insurer." *Northfield Ins. Co. v. Barlow*, 983 F.Supp. 1376 (N.D. Fla. 1997); *see also Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*, 795 F.2d 940, 942-43 (11th Cir. 1986) (materiality is "that which could possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk"). The materiality in the marine insurance context is broadly defined to include anything that could influence the insurer's evaluation of the risk presented by the insured. *HIH Marine*, 211 F.3d at 1363-64, *citing Northfield Ins. Co.*, 983 F.Supp. at 1380. Similarly, if the insurance company would have rejected the risk or written the policy differently absent the

misstatement or omission, the misrepresentation is material. 8 BENEDICT ON ADMIRALTY, § 6.04
at 6-33 (Release No. 74, Sept. 1997).

Pursuant to the above materiality standard, district courts have determined that, as a matter
of law, each of the misrepresentations made by Frank Pierre are material to the risk considered by
insurers. Ownership interest and loss history are considered material to the marine insurance
contract, and the failure to disclose them violates the doctrine of *uberrimae fidei*. *See, e.g., Cigna
Property and Casualty Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 422 (9th Cir. 1998), *cert.
denied*, 120 S. Ct. 53 (1999); *Underwriters at Lloyd's v. Kenney*, 986 F.Supp. 1384 (S.D.Fla. 1997),
*aff'd by* 144 F.3d 56 (11th Cir. 1998) (holding that the failure to disclose loss history is a material fact
which affects the risk assumed in providing insurance, and thus, voids the policy). Similarly, the
presence of hired crew increases the hazard insured against.[3] *Fireman's Fund Ins. Co. v. Cox*, 742
F.Supp. 609, 611 (M.D. Fla. 1989), *judgment aff'd by* 892 F.2d 87 (11th Cir. 1989) (finding the
coverage afforded to the "crew" mirrors the vessel owners' potential liability under the maritime law
and is material to the risk). Likewise, a misrepresentation as to the location where the vessel is kept
increases the hazard insured against, is material to the risk and voids the subject policy. *AXA Global
Risks (UK), Ltd. v. Webb*, 2000 AMC 2679 (M.D. Fla. 2000) (granting summary judgment where
insurance applicant did not disclose correct location of vessel). An applicant for insurance violates
*uberrimae fidei* by failing to disclose the actual owner of the vessel, even where the applicant holds

---

[3] Frank Pierre's Counter-claim asserts the hiring of a "delivery captain" does not constitute a "paid crew" and therefore
did not constitute a misrepresentation. (Answer and Counter-Claim, ¶ 7). However, the policy itself distinguishes
between a "covered person" and a paid captain or crew. (Policy, p. 1). Since the policy does not provide a definition
for captain or crew, the court must look to the commonly accepted definitions of these terms. *Fireman's Fund Ins. Co.
v. Cox*, 742 F.Supp. at 610. The crew is usually defined as those individuals in the employ of the vessel and in aid of
its navigation. *Fireman's Fund*, at 610-11. Pierre's contention that the "delivery captain" was not aiding in the
navigation of the vessel belies the evidence and lacks merit.

close ties with the actual owner. *Griffith v. American National Fire Ins. Co.*, 1997 AMC 2745 (D. Del. 1996) (finding failure to disclose boat actually owned by applicant's corporation and that previous insurer had refused to renew his insurance breached duty of utmost good faith and voided policy).

The Plaintiff Underwriters never would have accepted the risk and never would have agreed to underwrite the subject policy had they been informed by Frank Pierre of his prior marine losses (and resulting litigation) and the non-renewal of his prior policy. (Affidavit of B. A. Usher, Exhibit I). Nor would Underwriters have issued the policy to Frank Pierre for a vessel owned by his wife. (Affidavit of B. A. Usher, Exhibit I). Underwriters consider the information submitted by Frank Pierre from his application to be material to the risk. (Affidavit of B.A. Usher, Exhibit I). Had the true facts been disclosed, AXA would have declined to accept the risk. (Affidavit of B. A. Usher, Exhibit I); *see also, Certain Underwriters v. Giroire*, 27 F.Supp.2d at 1313.

## C.   Frank Pierre's material misrepresentations void the subject policy from its inception.

In a directly analogous case, the insured did not report a prior loss on the application for insurance and signed the application attesting that the information was true and accurate to the best of the applicant's knowledge and belief. *All Underwriters at Lloyd's (London) Subscribing to Policy No. 200-451-7275 v. Kenney*, 986 F.Supp. 1384, 1386 (S.D. Fla. 1997), *aff'd by* 144 F.3d 56 (11th Cir. 1998). The underwriters denied coverage for the theft of the insured boat after discovering the insured had suffered an undisclosed prior loss of a different vessel. *Kenney*, 986 F.Supp. at 1386. This Court held that, as a matter of law, the applicant's failure to report a prior loss on the application for insurance is a fact material to the risk relied on in providing insurance. *Kenney*, 986 F.Supp. at 1386. The Eleventh Circuit Court of Appeals affirmed the district court's order finding

the marine insurance policy void from its inception and granting summary judgment in favor of the insurer. *Kenney*, 144 F.3d 56 (11th Cir. 1998).

In another analogous case involving coverage for the theft of a vessel, the insured stated "none" on the written application requesting the applicant's "loss history" over the past three years. *Albany Ins. Co. v. Horak*, 1994 AMC 273 (E.D.N.Y. 1993). The applicant misrepresented, among other items, the insurance history and existence of prior accidents and repairs. *Albany*, 1994 AMC at 277-78. The application specifically requested the applicant to list all prior insurers and to state whether any of the vessel's policies had ever been cancelled; the *Albany* applicant did not disclose prior cancellations of coverage. *Albany*, 1994 AMC at 278. The district court determined the non-disclosures of prior loss history and coverage cancellations constituted material misrepresentations in connection with the application for insurance. *Albany*, 1994 AMC at 285. In granting the insurer's motion for summary judgment, the district court determined the applicant's misrepresentations operated to void the policy *ab initio* under the *uberrimae fidei* principle. *Albany*, 1994 AMC at 285.

Similarly, here, Frank Pierre made multiple material misrepresentations on his application for insurance. He admits signing the application prior to submitting it to underwriters. (Deposition of Frank Pierre, pp. 46-47; 64, Exhibit B). Frank Pierre's misrepresentations outlined above, including his loss history, void the subject policy from its inception under the firmly entrenched doctrine of *uberrimae fidei* and AXA is entitled to summary judgment in its favor. *See, e.g., Kenney*, 986 F.Supp. at 1386; *Albany*, 1994 AMC at 285.

## II. Frank Pierre is not absolved of his obligations under *uberrimae fidei* because his agent was involved in completing the application.

Frank Pierre contends in his Counter-claim that he informed the producing agent, Dyer

Marine Property, Inc., of the accurate information for the application and that he is thereby relieved

of any responsibility for the application's misrepresentation, which he blames on Dyer Marine.

(Frank Pierre's Answer and Counter-claim ¶ 7; Third Party Complaint ¶ 12, 16-19).

However, this Court and other federal courts have recognized that where a United States

producing broker seeks to obtain insurance for an insured from London underwriters, the broker is

acting solely as the agent for the insured:

> The recognized custom and usage of the London Insurance market is that the broker
> is the agent of the potential assured for most purposes, including the placement of
> insurance. The potential assured is recognized as the broker's client. The recognized
> roles of the broker is to obtain the best possible terms and quotation he can from the
> market for his client.

*Edinburgh Assurance Co. v. R.L. Burns Corp.*, 479 F.Supp. 138, 144 (C.D. Cal. 1979), *as cited in*

*Certain Underwriters v. Giroire*, 27 F.Supp.2d at 1313. The general rule in the context of marine

insurance is that a producing broker acts as the agent for the insured. *Dreiling v. Maciuszek*, 780

F.Supp. 535, 540 (N.D. Ill. 1991).

As this Court previously determined in similar circumstances, "[t]he insurer is not to blame

if the broker erroneously prepares the application, because the insurer issues the policy based on the

application." *Certain Underwriters*, 27 F.Supp.2d at 1313. Rather, the insurer is entitled to rely on

the representations of the insured's agent. *See Dreiling v. Maciuszek*, 780 F.Supp. 535, 541 (N.D.

Ill. 1991) (in marine insurance the broker acts as agent for the insured, not the insurer, thus boat

owner is charged with knowledge that his broker possessed but failed to communicate to the insurer).

In the instant case, Frank Pierre approached Gary Dyer of Dyer Marine, Inc., as a local

broker, to obtain marine insurance after receiving the letter providing notice of non-renewal of

coverage for *The Four of Us*. (Deposition of Frank Pierre, pp. 47-48, 51-52, Exhibit "B"; Deposition

of Dwight Dyer, pp. 33, 43-44, attached as Exhibit "J"). Dyer received the blank Application form from Insco Marine, Inc., the broker in New York, and furnished Frank Pierre with the Insurance Application. (Deposition of Frank Pierre, pp. 35, 48, Exhibit B; Deposition of Dwight Dyer, pp. 36, Exhibit J). Dyer furnished the completed application and the survey conducted by Jacques Marine to Insco Marine, Inc. in New York to explore whether it could obtain coverage. (Deposition of Dwight Dyer, p. 34, 40, Exhibit J). Once the policy issued, Insco sent it to Mr. Dyer, who furnished the policy to Frank Pierre. (Deposition of Dwight Dyer, p. 47, Exhibit J). Dyer served merely as a local, procuring agent acting on behalf of the insured. (Deposition of Dwight Dyer, p. 43, Exhibit J).

Dyer did not have any contractual relationship with AXA or T.L. Dallas and had no authority to bind coverage on behalf of AXA. (Deposition of Dwight Dyer, p. 8, 42, Exhibit J). In fact, Dyer never even communicated directly with AXA. (Deposition of Dwight Dyer, pp. 8, 34, 42-43, Exhibit J). Dyer only deals with the U.S. Surplus Lines agent in New York. (Deposition of Dwight Dyer, pp. 42-43, Exhibit J).

The doctrine of *uberrimae fidei* requires the applicant to voluntarily and accurately disclose to the marine insurer all material risks; Frank Pierre cannot escape this requirement by passing the responsibility on to his agent, as a matter of law. *Certain Underwriters v. Giroire*, 27 F.Supp.2d at 1313.

## III. THE SUBJECT POLICY IS VOID *AB INITIO* BECAUSE FRANK PIERRE LACKED AN INSURABLE INTEREST.

Under the undisputed facts and pleadings, Frank Pierre was not the owner of *The Four of Us* for all times material. The policy under which Frank Pierre seeks coverage is void for the well-settled policy reason that, although he was the name insured, he lacked any insurable interest in the vessel.

This Court determined that an entrenched principle of federal admiralty law exists on the issue of insurable interest in the marine insurance context. *ABB Power T & D Co., Inc. v. Gothaer Versicherungsbank Vvag*, 939 F.Supp. 1568, 1578 (S.D. Fla. 1996). The insured bears the burden of proving the existence of his/her insurable interest in order to recover under an insurance policy. *El Fenix De Puerto Rico v. Serrano Gutierrez* 786 F.Supp. 1065, 1069 (D. P.R. 1991). In the absence of an insurable interest, "an insurance contract is regarded as void and unenforceable." COUCH. *supra* at 41-5. In sum, "the simple rule that one cannot insure for his own benefit the property of another" remains a governing principle of black-letter insurance law. 4 Appleman, INSURANCE LAW AND PRACTICE §2121, at 26-27 (Rev. ed. 1969); *see also El Fenix de Puerto Rico v. Serrano Gutierrez*, 876 F. Supp. 1065 (D. P.R. 1991) (named insured was not entitled to coverage under marine policy due to lack of insurable interest when he was no longer vessel owner when policy was procured and loss occurred); *Abraham v. New York Underwriters Ins. Co.*, 196 S.E. 531, 534 (S.C. 1938) (where policy holder had no insurable interest either at the time the policy was procured or at the time of the loss, the policy is "absolutely null and void from its inception").

The Ninth Circuit addressed a similar arrangement in which the wives of businessmen, the Steinbach Brothers, held title to the subject dredge while the husbands procured the insurance policy. *Universal Ins. Co. v. Steinbach*, 170 F.2d 303, 304 (9th Cir. 1948). The brothers intended to eventually transfer title from the wives to a corporation. *Steinbach*, 170 F.2d at 304. In *Steinbach*, the brothers provided the insurer with full and complete information as to the ownership and the policy issued in the name of the wives, as owners. *Steinbach*, 170 F.2d 305. The court determined at that point, the Steinbach brothers had no interest in the dredge and no interest passed at that time; the brothers gained an insurable interest only by virtue of a subsequent agreement. *Steinbach*, 170 F.2d at 305.

Here, the pleadings and the whole record establish that Frank Pierre fails to meet the burden

of proving he possessed an insurable interest in the *The Four of Us* at the time the policy issued and

at the time of loss. Rather, Frank Pierre admits that at all times material, Yola Pierre was the sole

owner of the vessel. (Deposition of Frank Pierre, pp. 16-17, 69, Exhibit B). In fact, Frank Pierre

affirmatively transferred the vessel for the very purpose of making it an asset owned solely by Yola

Pierre. (U.S. Coast Guard Certificate of Documentation, Exhibit E; Application for Initial Issue,

Exhibit F). By Frank Pierre's design, he divested all ownership of the vessel, and secured

documentation for the vessel to reflect Yola Pierre is the sole owner. (Pierres' Third Party

Complaint, ¶ 11; Deposition of Frank Pierre, pp. 16-17; 69, Exhibit B). Additionally, the record is

devoid of any evidence that Frank Pierre derived a pecuniary benefit from the vessel. At no time

material did Frank Pierre ever possess a claim of right over *The Four of Us* that was enforceable over

Yola Pierre's superior and exclusive ownership rights. Therefore, on the undisputed evidence, Frank

Pierre fails to prove the existence of an insurable interest as owner of the vessel, and is thereby

precluded from recovering under the policy, as a matter of law.

## IV.   YOLA PIERRE, THE VESSEL OWNER, IS NOT ENTITLED TO COVERAGE.[4]

It is undisputed that Yola Pierre did not apply for insurance from AXA. (Yacht Application,

Exhibit A). Yola Pierre is not listed as either a co-insured or a loss payee on either the application

or the policy. (Yacht Application, Exhibit A; Insurance Policy, Exhibit C).

It is an axiomatic principle of Florida insurance law that insurance policies provide coverage

only to those individuals or entities that are "insureds" thereunder. *Oceanus Mut. Underwriting*

*Ass'n (Bermuda), Ltd. v. Fuentes*, 456 So. 2d 1230 (Fla. 3d DCA 1984), *review denied*, 466 So. 2d

---

[4] In addition to the previously-asserted grounds for declaratory judgment in favor of AXA, AXA submits the following arguments directed specifically to Yola Pierre's Counter-claim.

217 (Fla. 1985) (owner of vessel must also be named insured to be covered under policy); *ABB Power T&D Co., Inc. v. Gothaer Versicherungsbank VVAG*, 939 F. Supp. 1568, 1578 (S.D. Fla. 1996) ("The initial finding essential to this case is whether or not [claimants] are named assureds under the policy in question"). Thus, as a matter of insurance contract law, the fact that Yola Pierre was never listed as a named insured in the AXA policy precludes her from asserting coverage and seeking to recover under the policy.

AXA never contracted to cover a vessel owned by Yola Pierre. "It is a well-settled rule that a court shall not rewrite a contract of insurance extending the coverage afforded beyond that plainly set forth in the insurance contract." *AAA Life Ins. Co. v. Nicolas*, 603 So. 2d 622, 623 (Fla. 3d DCA 1992); *see Pastori v. Commercial Union Ins. Co.,* 473 So. 2d 40, 41 (Fla. 3d DCA 1985) ("the courts have no power simply to create coverage out of whole cloth when none exists on the face of an insurance contract"); *see also Oceanus Mutual Underwriting Ass'n*, 456 So. 2d at 1232, *quoting United States Fire Ins. Co. v. Morejon*, 338 So. 2d 223, 225 (Fla. 3d DCA 1976), *cert. denied sub. nom. Rebozo v. Morejon*, 345 So. 2d 426 (Fla. 1977) (it is a well-settled rule "that a court shall not rewrite a contract of insurance extending the coverage afforded beyond that plainly set forth in the insurance contract"). Granting coverage to Yola Pierre under the circumstances of this case would necessarily re-write the AXA policy -- written from the onset exclusively for Frank Pierre, a professional charter company -- to include risks never contemplated or agreed to by any of the parties.

## CONCLUSION

The undisputed material facts demonstrate that the Defendant/Insured misrepresented or failed to disclose facts material to the risk and, therefore, the policy is void from its inception as a matter of law. Further, Frank Pierre did not possess an insurable interest in the vessel. The

uncontradicted evidence is that the insurer reasonably considered the mis-information provided by Frank Pierre to be material to its decision to accept the risk. As a matter of law, Frank Pierre may not escape the application of *uberrimae fidei* by hiding behind his agent. Rather, Frank Pierre's affirmative misrepresentations operate to void the policy *ab initio*. For the foregoing reasons, AXA's Motion for Summary Judgment should be granted.

**WHEREFORE**, the Plaintiff, AXA GLOBAL RISKS (UK) LTD. respectfully submits there are no genuine issues of material fact as to Plaintiff's Complaint for Declaratory Judgment and the Counter-claim asserted by Frank Pierre, Jr. and Yola Pierre and, accordingly, moves the Court for entry of summary judgment in Plaintiff's favor and respectfully request the court to award reasonable attorney's fees pursuant to Florida Statute §57.105 (2000) as Defendant's claim is not supported by the material facts necessary to establish the claim and is not supported by the application of existing law.

Respectfully submitted,

JONATHAN W. SKIPP
Florida Bar No. 710570
STEPHANIE H. WYLIE
Florida Bar No. 0130140

HORR, NOVAK & SKIPP, P.A.
Attorneys for Plaintiff
One Datran Center, Suite 1104
9100 S. Dadeland Boulevard
Miami, Florida 33156
Telephone: (305) 670-2525
Telefax: (305) 670-2526

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY a true and correct copy of the foregoing was mailed this _____ day

of June, 2001 to: Robert L. Gardana, Esq., Attorney for Defendants/Counter-Plaintiffs, 9220 S.W.

72nd Street, Suite 203, Miami, Florida 33173 and Patrick A. Scott, Esq., Attorneys for Third-Party

Defendants, Law Offices of Patrick A Scott, 19 West Flagler, Suite 707, Miami, Florida 33130.

JONATHAN W. SKIPP
Florida Bar No. 710570
STEPHANIE H. WYLIE
Florida Bar No. 0130140

W. 2856 PLDG-Msj-moi.wpd

**EXHIBIT "A"**

Insurance Brokers
Marine Underwriting Agents
Dallas House, Low Moor
Bradford BD12 0HF



**TLDallas**
*Insurance since 1919*

T L Dallas (Special Risks) Ltd

Telephone: 01274 465500
Fax: 01274 465502/3

## YACHT APPLICATION

| INSURED'S NAME FRANK PIERRE JR | INSURED'S AGE 55 | DATE 7 | PRODUCER CODE |
|---|---|---|---|

| MAILING ADDRESS 1640 DAYTONIA RD | | PRODUCER NAME |
|---|---|---|

| CITY MIAMI BEACH COUNTY | STATE FL | ZIP 33141 | PRODUCER ADDRESS |
|---|---|---|---|

| PHONE 305-866-9748 HOME | BUSINESS | PHONE |
|---|---|---|

| OCCUPATION MEDICAL DOCTOR | LIENHOLDER INFORMATION STERLING BANK |
|---|---|

| VESSEL NAME THE FOUR OF US | NAME |
|---|---|

| EFFECTIVE DATE 7/13/99 | NUMBER & STREET |
|---|---|

| LAID UP FROM____ TO____ | ON SHORE AFLOAT | CITY | STATE | ZIP CODE |
|---|---|---|---|---|

### COVERAGE WILL NOT BE PROVIDED UNLESS REQUESTED HEREON

| COVERAGES | SUM INSURED | EQUIPMENT | | | PRIMARY POWER | SAIL |
|---|---|---|---|---|---|---|
| HULL - PHYSICAL DAMAGE | | BILGE PUMPS | ✓ | AUX GENERATOR DIESEL | ✓ | OUTBOARD |
| TENDER / DINGHY | | COOKING STOVE | ✓ | EPIRB | | INBOARD |
| LIABILITY COVERAGE | | FLAME DETECTOR | ✓ | ENGINE ALARM | ✓ | INBOARD/OUTDRIVE |
| CREW LIABILITY | | CO2/HALON SYSTEM | ✓ | LIFE RAFT | ✓ | OTHER |
| OWNER OPERATOR M&C | | FIRE EXTINGUISHERS | ✓ | SONAR | | TYPE OF HULL | SAILBOAT |
| MEDICAL PAYMENTS | | ANTI-THEFT DEVICES | ✓ | GPS | ✓ | Fibegh | PERFORMANCE |
| COMMERCIAL PASSENGER LIABILITY | | DEPTH SOUNDER | ✓ | OTHER (LIST BELOW) | | | RUNABOUT |
| UNINSURED BOATER | | RADAR | ✓ | | | HULL MATERIAL | WOOD |
| TRAILER | | LORAN/DIRECTION FINDER | ✓ | | | | METAL |
| PERSONAL PROPERTY | | SHIP TO SHORE RADIO | ✓ | | | | FIBREGLASS |
| NON-EMERGENCY | | SATNAV/OMEGA | ✓ | | | FUEL TANK | METAL |
| OTHER | | AUX GENERATOR GAS | | | | ALum. | FIBREGLASS |

| VESSEL INFORMATION | YEAR | LENGTH | DATE PURCHASED | PURCHASE PRICE | PRESENT VALUE 250-CCO | MAX SPEED 20Kh | REGISTRATION NUMBER 9597827 |
|---|---|---|---|---|---|---|---|

| HULL IDENTIFICATION NUMBER: MPC 39024 A989 | MANUFACTURER/MODEL MAINSHIP |
|---|---|

| TENDERS OR DINGHIES: ɛ | STORED AT (CITY, CO, ST): RESIDENCE |
|---|---|

| ANTI-THEFT PRECAUTIONS: ALARM | |
|---|---|

| WATERS TO BE NAVIGATED: US COASTAL WATERS |
|---|

| WILL VESSEL BE LOCATED BETWEEN 12° 40' - 25° NORTH AND 55° - 85° WEST DURING THE PERIOD JULY 1ST - NOV 1ST | YES/NO |
|---|---|

### ENGINE/OUTBOARD MOTOR INFORMATION

| ENG | H.P. | GASOLINE | DIESEL | YEAR | DATE PURCHASED | PURCHASE PRICE | PRESENT VALUE |
|---|---|---|---|---|---|---|---|
| 1 | 300 | | ✓ | 1995 | | 50.000 | |
| 2 | 300 | | ✓ | 1995 | | 50.000 | |
| 3 | | | | | | | |

| | MANUFACTURER/MODEL | SERIAL NUMBER |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |

| DATE VESSEL LAST SURVEYED JUNE 29, 1999 | ASHORE / AFLOAT |
|---|---|

| TRAILER INFORMATION | | | | YEAR | | DATE PURCHASED | PURCHASE PRICE | | PRESENT VALUE | |
|---|---|---|---|---|---|---|---|---|---|---|
| MANUFACTURER/MODEL: | | | | SERIAL NUMBER: | | | | | | |
| DETAILS OF PREVIOUS VESSELS OWNED: | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| OPERATORS (ALWAYS LIST INSURED AS OPERATOR # 1) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| # | NAME | | DATE OF BIRTH | AUTO DRIVERS LICENCE # | STATE | SOCIAL SECURITY # | USCG/POWER SQUADRON CERTIFICATE | | |
| 1 | FRANK · PIERRE JR | | 1L-17-4L | P60020C | IL | 059424134 | | | |
| 2 | | | | 44417-0 | | | | | |
| 3 | | | | | | | | | |

| # | VIOLATIONS/SUSPENSIONS (INCLUDING AUTO) IN LAST 5 YEARS | YEARS OF BOAT OWNERSHIP |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |

| GENERAL INFORMATION | | | | | | | |
|---|---|---|---|---|---|---|---|
| # | EXPLAIN ALL "YES" RESPONSES IN REMARKS | YES | NO | # | EXPLAIN ALL "YES" RESPONSES IN REMARKS | YES | NO |
| 1 | IS THE BOAT CHARTERED TO OTHERS WITH CAPTAIN? | | ✓ | 6 | IS THE BOAT USED COMMERCIALLY OR FOR BUSINESS PURPOSES? | | ✓ |
| 2 | IS THE BOAT CHARTERED TO OTHERS WITHOUT CAPTAIN? | | ✓ | 7 | DOES THE APPLICANT EMPLOY A PAID CREW IF SO HOW MANY? | | ✓ |
| 3 | IS THE BOAT USED FOR RACING? | | ✓ | 8 | WAS ANY OPERATOR INVOLVED IN A MARINE LOSS IN THE LAST 10 YEARS (INSURED OR NOT?) | | ✓ |
| 4 | IS THE BOAT USED FOR WATER SKIING OR DIVING? | | ✓ | 9 | WAS ANY COVERAGE DECLINED, CANCELLED OR NON-RENEWED DURING THE LAST 5 YEARS? | | ✓ |
| 5 | IF THE BOAT IS USED FOR FARE PAYING PASSENGER CHARTERS, WHAT IS THE AVERAGE NUMBER OF PASSENGERS PER TRIP | | | | | NUMBER OF TRIPS PER YEAR | |

| REMARKS |
|---|
| |
| |
| |
| |
| |
| |
| |

## PLEASE READ BEFORE SIGNING APPLICATION

1. This application will be incorporated in its entirety into any relevant policy of insurance where insurers have relied upon the information contained herein.
2. Any misrepresentations in this application for insurance, will render insurance coverage null and void from inception. Please therefore check to make sure that all questions have been fully answered and that all facts material to your insurance have been disclosed, if necessary by a supplement to the application.
3. A photograph of the vessel is required to be submitted with this application.

NOTICE:

The normal procedure used by the company to evaluate applications may include obtaining an investigation consumer and credit report involving information on such things as charter, general reputation, personal characteristics and mode of living. Information on the nature and scope of such a report, if one is made, will be given to you upon request.

| APPLICANT SIGNATURE: | SIGNATURE DATE: 7/13/99 |
|---|---|

Maine Insurance Agents
Dallas House, Low Moor
Bradford BD12 0HF

Telephone: 01274 465507

## T L Dallas

*Insurance since 1919*

T L Dallas (Special Risks) Ltd

### YACHT APPLICATION

| INSUREDS NAME | | | | INSUREDS AGE | DATE | | PRODUCER CODE | |
|---|---|---|---|---|---|---|---|---|
| MAILING ADDRESS | | | | | PRODUCER NAME | | | |
| CITY | COUNTY | | STATE | ZIP | PRODUCER ADDRESS | | | |
| PHONE | HOME | | BUSINESS | | PHONE | | | |
| OCCUPATION | | | | | **LIENHOLDER INFORMATION** | | | |
| VESSEL NAME | | | | | NAME | | | |
| EFFECTIVE DATE  FROM | | TO | | | NUMBER & STREET | | | |
| LAID UP  FROM | | TO | ON SHORE AFLOAT | | CITY | | STATE | ZIP CODE |

### COVERAGE WILL NOT BE PROVIDED UNLESS REQUESTED HEREON

| COVERAGES | SUM INSURED | EQUIPMENT | | PRIMARY POWER | SAIL |
|---|---|---|---|---|---|
| HULL - PHYSICAL DAMAGE | | BILGE PUMPS | AUX GENERATOR DIESEL | | OUTBOARD |
| TENDER / DINGHY | | COOKING STOVE | EPIRB | | INBOARD |
| LIABILITY COVERAGE | | FLAME DETECTOR | ENGINE ALARM | | INBOARD/ OUTDRIVE |
| CREW LIABILITY | | CO2/HALON SYSTEM | LIFE RAFT | | OTHER |
| OWNER OPERATOR M&C | | FIRE EXTINGUISHERS | SONAR | TYPE OF HULL | SAILBOAT |
| MEDICAL PAYMENTS | | ANTI-THEFT DEVICES | GPS | | PERFORMANCE |
| COMMERCIAL PASSENGER LIABILITY | | DEPTH SOUNDER | OTHER (LIST BELOW) | | RUNABOUT |
| UNINSURED BOATER | | RADAR | | HULL MATERIAL | WOOD |
| TRAILER | | LORAN/DIRECTION FINDER | | | METAL |
| PERSONAL PROPERTY | | SHIP TO SHORE RADIO | | | FIBREGLASS |
| NON-EMERGENCY | | SATNAV/OMEGA | | FUEL TANK | METAL |
| OTHER | | AUX GENERATOR GAS | | | FIBREGLASS |

| VESSEL INFORMATION | YEAR | LENGTH | DATE PURCHASED | PURCHASE PRICE | PRESENT VALUE | MAX SPEED | REGISTRATION NUMBER |
|---|---|---|---|---|---|---|---|
| HULL IDENTIFICATION NUMBER | | | | | MANUFACTURER/MODEL: | | |
| TENDERS OR DINGHIES | | | | | STORED AT (CITY, DO, BT): | | |
| ANTI-THEFT PRECAUTIONS: | | | | | | | |
| WATERS TO BE NAVIGATED: | | | | | | | |

WILL VESSEL BE LOCATED BETWEEN 12°40 - 25° NORTH AND 55° - 85° WEST DURING THE PERIOD JULY 1ST - NOV 1ST                     YES/NO

### ENGINE/OUTBOARD MOTOR INFORMATION

| ENG | H.P | GASOLINE | DIESEL | YEAR | DATE PURCHASED | PURCHASE PRICE | PRESENT VALUE |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |

| MANUFACTURER/MODEL | | SERIAL NUMBER | |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | | | |

| DATE VESSEL LAST SURVEYED | ASHORE / AFLOAT |
|---|---|

**TRAILER INFORMATION**

| MANUFACTURER/MODEL: | | SERIAL NUMBER: | | | | |
|---|---|---|---|---|---|---|

DETAILS OF PREVIOUS VESSELS OWNED:

**OPERATORS** (ALWAYS LIST INSURED AS OPERATOR # 3)

| # | NAME | DATE OF BIRTH | AUTO DRIVERS LICENCE # | STATE | SOCIAL SECURITY # | USCG/POWER SQUADRON CERTIFICATE |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |

| # | VIOLATIONS/SUSPENSIONS (INCLUDING AUTO) IN LAST 5 YEARS | YEARS OF BOAT OWNERSHIP |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |

**GENERAL INFORMATION**

| # | EXPLAIN ALL "YES" RESPONSES IN REMARKS | YES | NO | # | EXPLAIN ALL "YES" RESPONSES IN REMARKS | YES | NO |
|---|---|---|---|---|---|---|---|
| 1 | IS THE BOAT CHARTERED TO OTHERS WITH CAPTAIN? | | | 6 | IS THE BOAT USED COMMERCIALLY OR FOR BUSINESS PURPOSES? | | |
| 2 | IS THE BOAT CHARTERED TO OTHERS WITHOUT CAPTAIN? | | | 7 | DOES THE APPLICANT EMPLOY A PAID CREW IF SO HOW MANY? | | |
| 3 | IS THE BOAT USED FOR RACING? | | | 8 | WAS ANY OPERATOR INVOLVED IN A MARINE LOSS IN THE LAST 10 YEARS (INSURED OR NOT?) | | |
| 4 | IS THE BOAT USED FOR WATER SKIING OR DIVING? | | | 9 | WAS ANY COVERAGE DECLINED, CANCELLED OR NON-RENEWED DURING THE LAST 5 YEARS? | | |
| 5 | IF THE BOAT IS USED FOR FARE PAYING PASSENGER CHARTERS, WHAT IS THE AVERAGE NUMBER OF PASSENGERS PER TRIP | | | | NUMBER OF TRIPS PER YEAR | | |

**REMARKS**

## PLEASE READ BEFORE SIGNING APPLICATION

1. This application will be incorporated in its entirety into any relevant policy of insurance where insurers have relied upon the information contained herein.
2. Any misrepresentations in this application for insurance, will render insurance coverage null and void from inception. Please therefore check to make sure that all questions have been fully answered and that all facts material to your insurance have been disclosed, if necessary by a supplement to the application.
3. A photograph of the vessel is required to be submitted with this application.

## NOTICE:

The normal procedure used by the company to evaluate applications may include obtaining an investigation consumer and credit report involving information on such things as charter, general reputation, personal characteristics and mode of living. Information on the nature and scope of such a report, if one is made, will be given to you upon request.

| APPLICANT SIGNATURE: | SIGNATURE DATE: |
|---|---|
| | |

EXHIBIT "B"

```
                              UNITED STATES DISTRICT COURT
                              SOUTHERN DISTRICT OF FLORIDA

                              IN ADMIRALTY

                              CASE NO:  00-388-CIV-MOORE


AXA GLOBAL RISKS (UK) LTD.,          )
                                     )
      Plaintiff/Cross-Defendant,     )
                                     )
vs.                                  )
                                     )
FRANK PIERRE, JR., individually,     )
                                     )
      Defendant/Counter-Plaintiff,   )
                                     )
and                                  )
                                     )
YOLA PIERRE, individually,           )
                                     )
      Counter-Plaintiff,             )
                                     x
```




DEPOSITION OF FRANK PIERRE, JR.


taken before Kerry Walker Porter, Court Reporter and

Notary Public in and for the State of Florida at

Large, 9100 South Dadeland Boulevard, One Datran

Center, Suite 1104, Miami, Florida, on Friday,

May 11, 2001, commencing at 1:50 p.m., pursuant to

Re-Notice of Taking Deposition Duces Tecum.

```
 1      October 24, and we did the repowering on August 19
 2      of '94.
 3                    MR. SKIPP:  Before we go any further,
 4      let me mark the August 1994 Bill of Sale as Exhibit
 5      4 and the October 1994 Bill of Sale as Exhibit 5.
 6                    (Thereupon, the Bills of Sale dated
 7                    8/19/94 and 10/24/94, were marked as
 8                    Plaintiff's Exhibits Nos. 4 and 5,
 9                    respectively, for Identification.)
10           Q.   (BY MR. SKIPP)  Dr. Pierre,
11      referring to the Bill of Sale that we have marked as
12      Exhibit 5, do you recognize the signature in box
13      number seven of that form?
14           A.   This is my signature.
15           Q.   It is your testimony today that the
16      Bill of Sale that we have marked as Exhibit 5,
17      documents your transferring ownership of the vessel
18      to your wife Yola Pierre; is that correct?
19           A.   I'm not sure what they mean by that
20      but ---
21           Q.   Well, let me ask you, what was the
22      purpose of the October '94 bill of sale?
23           A.   This, I don't know why they made it.
24      Probably they had my wife sign that.  I was supposed
25      probably to sign this one (indicating).
```

```
 1                Q.    You are referring to the August one?

 2                A.    The August '94, which is the date

 3    that we went and got the loan, but apparently when

 4    they realized that -- my wife went and signed, and

 5    when they realized that, so they make me sign that

 6    another day.

 7                Q.    But my question is, the purpose of

 8    executing the Bill of Sale in October 1994 was to

 9    transfer the vessel from you, as seller, to your

10    wife, as buyer; is that correct?

11                A.    It is not for the purpose of selling

12    it to my wife, but the purpose was, I wanted my wife

13    to get the loan, and so I went and get the loan just

14    for prevention in case if one day I would have a

15    lawsuit in my practice, and those assets will be

16    safe.

17                Q.    So in other words, you did not want

18    the boat in your name as a potential asset in the

19    event you were sued for malpractice.

20                A.    Exactly.

21                Q.    So again, then, the point of the Bill

22    of Sale in October 1994 was to transfer the vessel

23    as an asset from you to your wife.

24                A.    That's correct.

25                Q.    Now, as a result of the Bill of Sale
```

PORTER, WALKER & ASSOCIATES, INC.

```
1              A.    No.
2                    MR. SKIPP:   Let's mark the Marine
3         Service Contract as Exhibit 7 before we move on.
4                    (Thereupon, a two-page
5                    Intercontinental Marine Service Contract
6                    Declaration Page, print date 5/19/95, was
7                    marked as Plaintiff's Exhibit No. 7 for
8                    Identification.)
9              Q.    (BY MR. SKIPP)   Between 1994 and the
10        date of the loss, the theft of your vessel in 1999,
11        did you do anything by way of substantial
12        renovations or modifications to the vessel other
13        than the replacement of the main engines?
14             A.    I had to replace all my electronics
15        on the boat.
16             Q.    When was that?
17             A.    This was after Hurricane George have
18        damaged my boat and I had to replace everything, all
19        the equipment on the boat.
20             Q.    All the electronic equipment?
21             A.    All the electronic equipment.  I had
22        to put a tower on the boat which was not on the
23        original.
24             Q.    A tuna tower?
25             A.    Yes.
```

```
1                  Q.    Other than replacing the tuna tower
2     and the electronics, did you do anything else by way
3     of major modifications or renovation to the vessel?
4                  A.    I have redone all the inside of the
5     boat.  The boat is in teak and I have redone all
6     the -- complete overhaul, the upholstery of the
7     wood.
8                        As a matter of fact, this thing, I
9     have done it just two months before they stole the
10    vessel.
11                 Q.    All the interior?
12                 A.    Yes.  I think it's two months.  I
13    don't remember exactly.
14                       MR. GARDANA:  The invoices say like
15    April or May.  You know, it's shortly before.
16                 Q.    (BY MR. SKIPP)  1999 sometime?
17                 A.    Yes.
18                       MR. GARDANA:  From Glass-Tech and
19    Navatech.
20                 Q.    (BY MR. SKIPP)  Is that who did the
21    interior rework, Navatech and Glass-Tech?
22                 A.    From the boat yard there, yes.
23                 Q.    When you redid the interior, did you
24    say you did it in teak, using teakwood?
25                 A.    Yes, teakwood, the floor.
```

PORTER, WALKER & ASSOCIATES, INC.

```
 1              Q.    We have two invoices, one from
 2    Glass-Tech corporation dated March 18, 1999, and a
 3    second invoice from Navatech Electronic Corp. that
 4    just states Invoice No. 4767.  Let me show you these
 5    two invoices and ask if they represent the interior
 6    renovation that you have described for me.
 7              A.    No.  In part of the Glass-Tech --
 8    part of the Glass-Tech invoice is on the interior
 9    part of it.
10              Q.    And part of it is for other things?
11              A.    Yes.
12              Q.    And the Navatech Electronic, what
13    does that represent?
14              A.    Those are all the electronics that
15    were damaged, that they have replaced for me.
16              Q.    Again, damaged in Hurricane George?
17              A.    In Hurricane George, yes.
18              MR. SKIPP:   Let's mark the Glass-Tech
19    Corporation March 1999 invoice as Exhibit 8 and the
20    Navatech Invoice 4767 as Exhibit 9.
21                   (Thereupon, a three-page fax dated
22                   4/27/99, including an invoice dated
23                   3/18/99, from Glass-Tech Corp., Nelson
24                   Fernandez, to Robert Gardana was marked as
25                   Plaintiff's Exhibit No. 8 for
```

```
 1                 Identification; and a two-page Navatech
 2                 Electronic Corp. Invoice No. 4767 with
 3                 copies of two checks attached, was marked
 4                 as Plaintiff's Exhibit No. 9 for
 5                 Identification.)
 6            Q.    (BY MR. SKIPP)   Where did you moor
 7   the vessel from the time you bought it in 1989 until
 8   the subject policy that we are here on today came
 9   into effect in 1999?
10            A.    The vessel always docked behind my
11   house, 1640 day Daytonia Road on Biscayne Point, and
12   I had a second house, it's a weekend house in
13   Islamorada, and the vessel would be docked there
14   from -- during the summer, during all summer when
15   the kids are on vacation, because we spent mostly
16   the summer down there until around wintertime, so
17   that we move it back to Miami.
18            Q.    During the last couple of years that
19   you were running the boat from, let's say '97 to
20   '99, did you have a permanent captain or caretaker
21   for the vessel?
22            A.    No.   No permanent captain.
23            Q.    Would you run the boat yourself?
24            A.    I run the boat myself, and when I'm
25   fishing, I usually get one of those guides, you
```

PORTER, WALKER & ASSOCIATES, INC.

1    know, that tell you where the fish are, and I always

2    get a guide with me.

3                It's very messy, you know.  They put

4    their hands in the bait, and give them a couple of

5    fish after, in the bill, and that's all, they are

6    happy.

7           Q.   Going back for a moment to the

8    Certificate of Documentation that we talked about

9    earlier, which we marked as Exhibit 6, let me also

10    show you an invoice from Sharon Chadwick, as well as

11    a letter from Sharon Chadwick, both dated August 17,

12    1994, and ask if these documents reflect the

13    transaction at that time when the boat was

14    transferred to Yola Pierre?

15           A.   Yes.

16               MR. SKIPP:  We will mark those two

17    documents as Composite Exhibit 10.

18               (Thereupon, a Sharon Chadwick Vessel

19            Documentation, Inc. Statement dated

20            8/17/94 and a letter dated 8/17/94 from

21            Sharon Chadwick Vessel Documentation,

22            Inc., To Whom it May Concern, was marked

23            as Plaintiff's Composite Exhibit No. 10

24            for Identification.)

25           Q.   (BY MR. SKIPP)  Dr. Pierre, aside

```
 1    from the theft of the vessel that we are here on
 2    today, did you or your wife have any losses
 3    involving the 39-foot Mainship -- other than the
 4    theft that we are here on today?
 5              A.   All right.  We have Hurricane George.
 6    The boat was down in the Keys.  That's the hurricane
 7    that mainly went down in the Florida Keys, and we
 8    had a lot of damage on the boat.
 9              Q.   The boat was moored at your
10    Islamorada home at that time?
11              A.   Exactly.  So we had a lot of damage,
12    all the interior, water.  It was a very wet
13    hurricane.  We had water all over.  Apparently, one
14    of the windows could have opened and so it was -- so
15    that's why I had to go and change everything.
16                   And then after ---
17              Q.   What was the date of that, do you
18    remember?
19              A.   I don't remember the exact date of
20    Hurricane George.  And then after that the boat was
21    in my house in Miami Beach, and I was, exactly,
22    preparing to go down to the Keys, because every year
23    I fish a tournament, the Islamorada Fishing
24    Tournament.
25                   And I was sitting on my porch.  I was
```

1   doing my tackle that Sunday, I remember that, and I

2   had a friend who came from Montreal that Sunday

3   night, call, and so my wife and I, we had to go to

4   their place. We had dinner with them that night, in

5   South Miami. And I left -- because, you know, the

6   tournament was to be due on the next following

7   weekend, so I was preparing tackle all Sunday, and I

8   was going to take the boat down because usually, at

9   that time, I never work on Tuesday, and I was going

10   to take the boat down on Tuesday.

11             And I had the guy who ask to take the

12   boat for me, and I had refused. I said, "No, I'll

13   do it myself."

14            Q.   Who wanted to take the boat down?

15            A.   Some guy, you know, who used to fish

16   with me, and he wanted to take the boat for me. He

17   said, "If you going to be busy, I'll take boat." I

18   said, "No."

19             And that Sunday night, we went -- we

20   came back probably around 11:00, and around 1:30 in

21   the morning, we heard our little dog start barking

22   and so we got up. And my wife went out and she

23   looked from the balcony and she wake me up and she

24   say "Frank, somebody by your boat." And she said,

25   "I saw a little boat next to your boat."

```
1                      And so I get up and I went, get up
2       from my bed and I said, "I don't see anything."  She
3       said, "Well put your glasses."  So I went and put my
4       glasses and I said, "Well, you're right."  There was
5       a little boat.
6                      So then I did some stupid thing.  So
7       I went and turned on the spotlights, because we
8       have -- from my bedroom I have some spotlights that
9       shine into the water.  So I went and put those, and
10      the guy saw that and run and get into his little
11      boat and run away.
12                     And so we call the police.  We call
13      the Miami Beach Police.  So the Miami Beach Police,
14      they came in and they don't want me to get on to the
15      boat until the Florida Marine Patrol boat came and
16      then that's -- and that's when we realize they broke
17      into the boat and they took all my fishing tackles,
18      the things I was preparing for the tournament.
19             Q.    Do you remember the date of that
20      incident?
21             A.    I don't know but I think we have ---
22      Robert, you have that Miami Beach Police ---
23                     MR. SKIPP:  Do you have that with
24      you?
25                     MR. GARDANA:  I thought you had it.
```

PORTER, WALKER & ASSOCIATES, INC.

```
 1              Q.    (BY MR. SKIPP)  Why don't I show you
 2   what appears to be a burglary report, Offense
 3   Incident Report from the Miami Beach Police, and ask
 4   if that's the report prepared as a result of the
 5   theft that occurred on your boat, or pilferage?
 6              A.    Yes, that's it exactly.  It
 7   happened -- yes, it happened on Sunday night, the
 8   23rd.  They came in in the morning during the night.
 9              Q.    What was the date?
10              A.    Well, it's Monday the 24th at one
11   o'clock in the morning.
12              Q.    What was the exact date?
13              A.    May 24.
14              Q.    Of what year?
15              A.    Of 1999.
16              MR. SKIPP:  Let's mark the Miami
17   Beach Offense Incident Report as Exhibit 11.
18                    (Thereupon, a four-page Miami Beach
19              Police Offense Incident Report dated
20              5/24/99 was marked as Plaintiff's Exhibit
21              No. 11 for Identification.)
22              Q.    (BY MR. SKIPP)  Am I correct that
23   the Hurricane George loss occurred prior to the
24   theft in May of 1999?
25              A.    That is correct.
```

```
 1                 Q.   To your recollection, would it have
 2      been the preceding summer of 1998?
 3                 MR. GARDANA:   I think it was
 4      September 25, 1998.
 5                 Q.   (BY MR. SKIPP)   Does that sound
 6      about right?
 7                 MR. GARDANA:   It was a late summer
 8      storm.
 9                 Q.   (BY MR. SKIPP)   So you told me about
10      the hurricane loss in 1998 and the vandalism or
11      theft in 1999, May of '99.
12                 Have you had any other losses with
13      this vessel, or any other vessel, for that matter?
14                 A.   Not at all.
15                 Q.   Now, did you have your boat insured
16      in 1998?
17                 A.   Yes.
18                 Q.   Let me show you a Vessel Owners
19      Application from Maritime Insurance Group which
20      appears to be dated July 24, 1997 and ask if that is
21      the application for insurance for the 1997-1998
22      year?
23                 A.   That is correct.   Yes.
24                 Q.   Why, in July of 1997, were you
25      requesting insurance as opposed to simply renewing a
```

```
 1                   A.    Yes, I think I do.  It was with
 2       Lloyd's of London.
 3                   Q.    Dr. Pierre, I may have a copy here.
 4                         I show you a cover note from Maritime
 5       Insurance Group which has a signature date of
 6       July 14, 1998.
 7                   A.    Yes, this is it.  Yes.
 8                   Q.    Do the balance of the pages reflect,
 9       to the best of your knowledge, the policy wording
10       for the policy term July 24, 1998 through July 24,
11       1999?
12                   A.    Yes.
13                         MR. SKIPP:  We will mark that as
14       Composite Exhibit 13.
15                         (Thereupon, a 21-page Maritime
16                         Insurance Group insurance policy dated
17                         7/14/98 was marked as Plaintiff's
18                         Composite Exhibit No. 13 for
19                         Identification.)
20                   Q.    (BY MR. SKIPP)  Were you required to
21       furnish a survey of the vessel for the '98-'99
22       policy?
23                   A.    I don't remember.
24                   Q.    Did you make any claims under the
25       '98-'99 policy that we have marked as Exhibit 13 for
```

```
 1    either the hurricane loss in September of '98 or the
 2    vandalism and theft in May of '99?
 3              A.    Yes, I did a claim for the Hurricane
 4    George.
 5              Q.    Who did you make that claim to?
 6              A.    Through Maritime Insurance.
 7              Q.    Through Maritime?
 8              A.    Yes.
 9              Q.    What was the nature of the damage
10    from the hurricane?
11              A.    It was water in my boat, and all my
12    electronics were taking water.
13              Q.    Was the boat in the water at your
14    dock during the hurricane?
15              A.    Yes.
16              Q.    What was the nature of the water in
17    the boat?
18              A.    The nature?
19              Q.    Did it sink?
20              A.    No, didn't sink.
21              Q.    How did water get in there?
22              A.    Water gets inside through the
23    windows -- in fact, we really don't know, but it was
24    really windy.  Some of those hatches might have
25    opened and we get water damage inside.
```

```
 1                    Q.    How much water actually entered the
 2    inside of the boat?
 3                    A.    All the upholstery.  They were all
 4    wet.  So is the lining on top of ---
 5                    Q.    The head liner?
 6                    A.    The head liner.
 7                    Q.    Did you go down and go on the boat
 8    once the hurricane had passed?
 9                    A.    After the hurricane passed, yes, I
10    went down.
11                    Q.    I mean, would you have been the first
12    person to go down and check the boat?
13                    A.    Yes.  Nobody else.
14                    Q.    When you went aboard, was there water
15    inside sufficient that it was above the flooring?
16                    A.    Oh, no.  Oh, no.  But you could see
17    that there were water because hurricane -- that
18    hurricane came on a Tuesday or -- I don't remember.
19    It was during the week, and we came down the weekend
20    right after and you could see that everything was
21    all wet.
22                    Q.    Was anyone staying at your house in
23    Islamorada when the hurricane hit?
24                    A.    No.
25                    Q.    Was anything done by way of special
```

```
 1   18,000.
 2              A.    Yes.  I think they paid that, yes.
 3              Q.    Did the work that was done by
 4   Glass-Tech and Navatech, was that completed as of
 5   May, the beginning of May, 1999?
 6              A.    More or less.
 7              Q.    In other words, at the time of your
 8   vandalism, theft at your house on May 24th, had the
 9   boat already been repaired from the hurricane?
10              A.    Repaired from the hurricane, yes.
11              Q.    Did you make a second insurance claim
12   as a result of the May 24 loss?
13              A.    I made a claim but this went under my
14   homeowner.
15              Q.    What company is that?
16              A.    Prudential.
17              Q.    Did you attempt to make a claim
18   against your marine policy?
19              A.    Yes, because I didn't know.  First
20   thing I did, I call Ann Marie Bothe again.
21              Q.    Did you call Ann Marie or Maritime --
22              A.    No, I call ---
23              Q.    (Continuing) -- Insurance Group?
24              A.    No, I call Maritime and Maritime
25   refer me again to Ann Marie.
```

```
 1              Q.    What became of your reporting of the
 2    loss to underwriters, to your marine underwriters?
 3              I'm sorry, let me rephrase it.   After
 4    contacting Ann Marie Bothe, what was the result of
 5    your claim for the vandalism or theft?
 6              A.    Ann Marie Bothe drove down with me --
 7    because at that time, after the vandalism, I took
 8    the boat down to the Keys, because I was fishing in
 9    a tournament.   And Ann Marie Bothe drove with me to
10    the keys, to my house in the Keys, to look at the
11    boat.
12              But eventually, she told me that this
13    was going to be covered under my homeowners, and it
14    was a couple of reels, fishing reels, and so I end
15    up -- my homeowners end up -- I went and buy all the
16    reels that was missing, and then I send the bill to
17    the insurance company and they send -- they send
18    part of the money.
19              Q.    To the best of your recollection,
20    what was taken from your boat in May of '99?
21              A.    Fishing reels, all the tackles and,
22    you know, I had a bunch of tackles, things prepared
23    already.   It's time consuming to do those things by
24    hand, and all those things were taken.
25              Q.    Was any equipment stolen other than
```

PORTER, WALKER & ASSOCIATES, INC.

```
 1        claim was beneath your deductible?
 2                  A.    No -- yes, something -- yes.
 3                  Q.    Is that why they didn't respond?
 4                  A.    They didn't respond, yes, and said I
 5        should go to my homeowners.
 6                  Q.    Did your homeowners pick up the
 7        claim?
 8                  A.    Yes, they paid me -- I send them a
 9        bill of what I spend and they just reimburse it.  I
10        think on my homeowner I had a deductible of $500 or
11        something like that.
12                        MR. GARDANA:   Plus some of those
13        items weren't on the boat.  They were on the patio.
14                        THE WITNESS:   Yes, some were on the
15        patio also.  That's why.
16                  Q.    (BY MR. SKIPP)   Now, on July 13th of
17        1999, you completed another yacht application for
18        insurance; is that correct?
19                  A.    I don't know.
20                  Q.    I'm showing you a copy and ask you if
21        that is the application?
22                  A.    Yes, I signed that application.
23                  Q.    And that was the one completed in
24        July of '99?
25                  A.    That was the one signed by me on July
```

```
 1    '99, yes.
 2              Q.   This is your signature in the lower
 3    left box on the second page?
 4              A.   Yes.
 5              Q.   Why were you applying yet again for
 6    insurance in July of '99?
 7              A.   I apply again for insurance -- not
 8    again, but I applied for insurance because Maritime
 9    have sent me a letter stating that because of the
10    loss that I have with Hurricane George, the
11    underwriter was not going to provide me insurance.
12              Q.   In other words, your '98-'99 policy
13    that we marked as Exhibit 13 would not be renewed --
14              A.   Exactly.
15              Q.   (Continuing) -- at the time of its
16    expiration?
17              A.   At the time, yes.
18              Q.   Where did you turn to for insurance
19    once you were advised by Maritime Insurance Group
20    that they would not renew coverage?
21              A.   My wife's cousin owns a boat also and
22    they referred me to Dyer Marine.
23              Q.   D-y-e-r?
24              A.   D-y-e-r, Dyer Marine.
25              Q.   Where are they located?
```

```
 1                A.    In Miami.
 2                Q.    Who at Dyer Marine did you deal with?
 3                A.    Gary Dyer.
 4                Q.    Did he provide you with the yacht
 5      application?
 6                A.    He did the yacht application.
 7                      MR. SKIPP:  Let's mark the T.L.
 8      Dallas yacht application as Exhibit 14.
 9                      (Thereupon, a two-page T.L. Dallas
10                 (Special Risks) Ltd. Yacht Application
11                 dated 7/13/99 was marked as Plaintiff's
12                 Exhibit No. 14 for Identification.)
13                Q.    (BY MR. SKIPP)  First let me ask
14      you, Dr. Pierre, who completed the application
15      itself?
16                A.    The application was completed by Gary
17      Dyer.
18                Q.    Where were you when this was
19      completed?
20                A.    This was in Miami Beach in my house.
21                Q.    Was he at your house?
22                A.    He came to my house with his son and
23      another friend.
24                Q.    Did Gary Dyer bring with him the
25      yacht application?
```

```
 1    named as an insured on the policy that you were
 2    requesting?
 3              A.    Well, to tell you the truth, I know
 4    that when we are insuring the boat, it's the boat
 5    that's being insured, it's not me or my wife.  The
 6    boat is the boat that I'm insuring.  If I'm insuring
 7    a car, I'm not insuring myself or my wife, I'm
 8    insuring the car.
 9              But they put me and my wife as driver
10    of the car.  So I don't know for a boat that I have
11    to tell him that this is Yola or this is Frank.
12              Q.    On the application you were asked
13    what was the present value; is that correct?
14              A.    I was not asked for the present value
15    but what I -- he followed the previous application
16    that I have and that's when ---
17              MR. GARDANA:  Object.  Don't guess.
18    Don't speculate what he did, because the survey was
19    done two weeks before, so they already had the
20    value.
21              THE WITNESS:  Yes.
22              MR. SKIPP:  Off the record.
23              (Discussion held off the record.)
24              Q.    (BY MR. SKIPP)  When did you first
25    contact Gary Dyer of Dyer Insurance regarding your
```

PORTER, WALKER & ASSOCIATES, INC.

```
 1    request for insurance for the boat?
 2              A.    Soon after I received the letter of
 3    Maritime saying they are not going to insure me for
 4    the coming year.  So I get Gary Dyer on the phone
 5    and he came to my house in Miami Beach, but the boat
 6    is in Islamorada, and he came in with the
 7    application.  He came in with the application, but
 8    then after that he went down to the Keys with
 9    Jacques Marine.
10              Q.    Did you complete the application the
11    first time or was that done on a subsequent time?
12              A.    I did not do the application.
13              Q.    At that time?
14              A.    At that time.
15              Q.    Then after you first met with Gary
16    Dyer, arrangements were made to survey the vessel in
17    Islamorada?
18              A.    That is correct.
19              Q.    And the survey resulted in the
20    June 29, 1999 Condition & Valuation Survey Report by
21    Jacques Marine Services.
22              A.    That is correct.
23              MR. SKIPP:  For the sake of
24    completeness, we will mark the June '99 survey
25    report from Jacques Marine as Composite Exhibit 15.
```

```
 1    me by Gary Dyer.
 2              Q.   On the application you indicated then
 3    that the boat is not chartered, with or without a
 4    captain; is that correct?
 5              A.   It's not chartered.
 6              Q.   And it is not.
 7              A.   No.
 8              Q.   Or never was.
 9              A.   Never.
10              Q.   In addition, you were asked, "Do you,
11    as applicants, employ a paid crew, and if so, how
12    many?"
13              Have you ever employed a paid crew
14    for the boat?
15              A.   No, I never employed a paid crew.
16              Q.   In terms of any crew that went with
17    you on fishing trips, anything like that, what was
18    your arrangement?
19              A.   I had ---
20              MR. GARDANA:   Object to the form.
21              THE WITNESS:   I had guides, the guys
22    who know the spots that go with me.  I give them
23    fish after, give them a couple of bucks and they --
24    like their beer down in the Keys and that's the
25    arrangement.
```

1                Q.    (BY MR. SKIPP)   The eighth question

2    on the application states, "Was any operator

3    involved in a marine loss in the last ten years,

4    insured or not," and that question is checked "No."

5                A.    No.  It's not.  I never been in any

6    loss.

7                Q.    Did you advise Gary Dyer that you had

8    had a hurricane loss with Hurricane George?

9                A.    Oh, but the operator, it's me.  I

10   never have any loss.  I never have any accident on

11   the boat.  But as far as the boat, Gary Dyer knows

12   that the boat was involved in the marine loss and

13   the theft in Miami Beach.

14               Q.    So it's your understanding when asked

15   that question that although your boat had a loss in

16   this hurricane, that didn't involve you as operator?

17               A.    No.  No.  That involved the boat.

18               Q.    Again, just so I'm clear on this

19   number eight question then, it's your testimony that

20   there were marine losses with the boat, but from

21   your standpoint as operator, you did not feel you

22   were involved in a marine loss?

23               A.    As operator I was not involved in any

24   marine loss, but the boat has the hurricane damage

25   and the theft in Miami Beach.

PORTER, WALKER & ASSOCIATES, INC.

```
 1                    Q.    Now, at any time during the ten years
 2     that you had this particular boat, was anyone the
 3     operator other than you?
 4                    A.    I'm the operator.  I took the boat to
 5     Bimini, to the Bahamas; I took the boat all over.
 6                    Q.    On this particular application, you
 7     identified yourself as the sole operator of the
 8     vessel; is that correct?
 9                    A.    Yes.
10                    Q.    The ninth question on the application
11     states "Was any coverage declined, canceled or non-
12     renewed during the last five years?"
13                          Did Gary Dyer ask you that question?
14                    A.    Gary Dyer ask, and that's the reason
15     I called him for insurance, that Maritime was not
16     going to renew me, and he stated that "This was a
17     hurricane-related matter and so therefore, we are
18     not going to deny you coverage."
19                    Q.    This is something Gary Dyer told you?
20                    A.    Yes.
21                    Q.    Did you show Mr. Dyer the letter from
22     Maritime Insurance?
23                    A.    Yes.  I even think he had a copy.
24                          MR. GARDANA:  Not only that, the non-
25     renewal hadn't occurred yet.
```

PORTER, WALKER & ASSOCIATES, INC.

```
 1                       THE WITNESS:  Hadn't occurred yet,
 2    yes.
 3                       MR. GARDANA:  That was still two
 4    weeks later.
 5              Q.    (BY MR. SKIPP)  Right.  But you had
 6    received a letter prior to the application from
 7    Maritime Insurance Group ---
 8              A.    As soon as I received that letter
 9    I ---
10              Q.    The letter you got from Maritime
11    Insurance Group stated that they were not going to
12    renew your coverage for the 1999 year?
13              A.    Well, they said that because of a
14    hurricane loss or something like that, that ---
15                       MR. GARDANA:  I was going to bring it
16    out earlier, but it is not from Maritime.  It's like
17    salespeople looking for work for insurance, so
18    Maritime has never sent him a letter saying there
19    was a non-renewel.
20              Q.    (BY MR. SKIPP)  Did you ever get a
21    document or letter from Maritime Insurance Group
22    advising of a non-renewal?
23              A.    No.  That's what I get.
24                       MR. SKIPP:  Let's mark this letter
25    you are referring to as Exhibit 16.
```

```
 1                    (Thereupon, a fax letter dated
 2               5/31/99 from Joel A. Berg, CIC of Seacoast
 3               Marine Insurance to Frank Pierre, Jr.,
 4               M.D., was marked as Plaintiff's Exhibit
 5               No. 16 for Identification.)
 6          Q.    (BY MR. SKIPP)  Now, the letter you
 7     are referring to is a letter from Joel A. Berg of
 8     Seacoast Marine Insurance dated May 31, '99; is that
 9     correct?
10          A.    That is correct.
11          Q.    In that letter it states, "We are now
12     directly servicing the policies you have with
13     Richard Sparrow and Company through Maritime
14     Insurance and Chris Cooper.  We have just been
15     advised by Richard Sparrow and Company that they
16     will not be offering renewal terms due to the two
17     claims that you have recently had.  Please be sure
18     to make arrangements to place your coverage for both
19     vessels with a new insurance carrier as we do not
20     have another insurance company to rewrite the
21     coverage for both vessels expiring on the 24th of
22     July, 1999."
23                    That statement is what you have been
24     referring to as the letter from Maritime Insurance;
25     is that right?
```

```
1                    A.    I don't remember that.
2                    Q.    But it is your understanding he did
3      go through the nine questions on the application.
4                    A.    Yes.
5                    Q.    I don't mean to be repetitive, but
6      the signature then on the lower left box of the
7      second page, is that your signature?
8                    A.    That's my signature.
9                    Q.    That was signed on July 13 of '99?
10                   A.    Yes, that is correct.
11                   Q.    Above your signature on the
12     application under the heading "Please read before
13     signing application," it states in paragraph two,
14     and I quote, "Any misrepresentations in this
15     application for insurance will render insurance
16     coverage null and void from inception.  Please,
17     therefore, check to make sure all questions have
18     been fully answered and that all facts material to
19     your insurance have been disclosed, if necessary, by
20     a supplement to the application."
21                         Do you remember reading that
22     language?
23                   A.    No, never.
24                   Q.    But the application was presented to
25     you for signature.
```

PORTER, WALKER & ASSOCIATES, INC.

```
 1              Q.   Okay.  So the cover note, which is a
 2    two-page document that we will mark as Exhibit 17,
 3    had your address incorrect.
 4              A.   Incorrect.
 5              Q.   And also identified the loss payee as
 6    the assured, rather than Sterling Bank who held the
 7    mortgage.
 8              A.   That's correct.
 9              Q.   As a result then, a policy
10    endorsement number one was issued correcting your
11    address and listing Sterling Bank & Trust as loss
12    payee.
13              A.   That's correct.
14              MR. SKIPP:  We will mark the
15    endorsement as Exhibit 18.
16                   (Thereupon, the T.L. Dallas two-page
17                   Cover Note dated 7/22/99 was marked as
18                   Plaintiff's Exhibit No. 17 and the Policy
19                   Endorsement Number One dated 10/22/99 was
20                   marked as Plaintiff's Exhibit No. 18 for
21                   Identification.)
22              Q.   (BY MR. SKIPP)  Did your packet that
23    you received from Dyer Insurance with the cover
24    note, also enclose the Private and Pleasure Yacht
25    Insuring Agreement Wording that we have here with
```

```
 1              Q.   (BY MR. SKIPP)   When you were making

 2    corrections on the cover note, did you, at any time

 3    after having received it, bring to Mr. Dyer's

 4    attention or anyone else, the fact that your wife,

 5    Yola Pierre, was the documented owner of the vessel?

 6              A.   No.

 7              Q.   Did you, at any time, ask that she be

 8    included as a named insured on the policy?

 9              A.   No, I did not ask that.

10              Q.   Did you, at any time, provide Dyer

11    insurance with a copy of the mortgage on the vessel?

12              A.   No, he didn't have a copy of the

13    mortgage, but he knew that it was Sterling Bank who

14    hold the mortgage.

15              Q.   How did he know that?

16              A.   Because I told him.

17              Q.   Is the First Preferred Mortgage that

18    you previously produced to us, is this an accurate

19    copy of the mortgage for the boat?

20              A.   Yes, I would think so.   Yes.

21              Q.   At any time from 1994 until the boat

22    was stolen, were there any other lien holders on the

23    boat other than Sterling Bank?

24              A.   No.

25                   MR. SKIPP:   We will mark the first
```

**EXHIBIT "C"**



**T L Dallas**
*Insurance since 1919*

Insurance Brokers
Marine Underwriting Agents
Credit Insurance Specialists
Independent Financial Advisors

# COVER NOTE

## Policy No: 200/533/.25177

T L Dallas (Special Risks) Ltd
Dallas House Low Moor
Bradford BD12 0HF

Telephone +44 (0)1274 465563
Fax +44 (0)1274 465502/3

In accordance with your instructions we have effected the following cover on your behalf subject to the terms and conditions in the policy wording and endorsements attached.

| Assured : | Producer : |
|-----------|-----------|
| Frank Pierre Jr MD<br>1660 Daytona Road<br>Miami Beach<br><br>FL 33141 | Insco Marine Inc<br>2031-8 Forest Avenue<br>Staten Island<br><br>NY 10303 |

| Vessel Name: | The Four Of Us | Model: | Cruiser |
|---|---|---|---|
| Year: | 1989 | Maker: | Mainship |
| ID Number: | MPC39024A989 | Length: | 39' |
| Engines: | Diesel | Type: | Twin 300hp |

Period of Cover: With effect from   July 09, 1999 00.01 LST   to   July 09, 2000 00.01 LST

Cover and Respective Insured Limits:

| Section: | Sum Insured: | Deductible: |
|----------|-------------|-------------|
| A) Hull | 250,000 | 5,000 |
| Tender | Not Covered | |
| Towing | Not Covered | |
| B) P + I | 300,000 | 500 |
| Crew Liability | Not Covered | |
| Commercial Passenger Liability | Not Covered | |
| Owner Operator | Not Covered | |
| C) Medical Payments | 5,000 | 100 |
| D) Uninsured Boaters | 25,000 | 500 |
| E) Trailer | Not Covered | |
| F) Personal Property | 5,000 | 500 |

Total Premium :   US$ 2310.00 C.R.O. + US$25 Policy Fee.

In the event of cancellation by the Assured minimum of 25% of premium deemed earned.
All fees earned at inception.



COMPOSITE
EXHIBIT
ALL-STATE® INTERNATIONAL

Member of the British Insurance

**Continuation Cover Note for Policy No: 200/533/25177**

| | |
|---|---|
| Laid Up Period : | None |
| Navigational Limits : | East Coast United States, Florida & Bahamas - not to exceed 100 miles offshore. |
| Conditions : | as per TLD/3/PPO/AXA |
| Warranties: | Warranted Private and Pleasure use only. |
| | Named Windstorm Deductible Clause. |
| | Warranted current out of water survey and all survey requirements complied with. |
| Endorsements : | None |
| Special Warranties or Conditions : | Warranted no known or reported losses as at 13th July 1999 |

Security as approved and agreed by you:

100% AXA Global Risks (UK) Ltd
per Cover Numbered 200/533

Loss Payee : Assured

Date : Wednesday, July 28, 1999

For and on behalf of Participating Underwriters

# PRIVATE AND PLEASURE YACHT INSURING AGREEMENT WORDING

## 1. DEFINITIONS

a)    "You and your" refer to the insured named on the declaration page.

b)    "We, us and our" refer to the insurers named on the declaration page or accompanying schedule of insurers.

c)    "Covered person," means you, or any person detailed on your application form which has been submitted and approved by us. This does not include either a paid captain and/or crew, or a person or organisation, or their employee or agent, operating a marina, boatyard, yacht club, charter operation, sales agency, refuelling dock or similar organisations.

d)    "Scheduled vessel" means the vessel described on the declaration page, including machinery, electrical equipment, sails, masts, spars, rigging, furniture, dinghy, outboard motor and all other equipment normally required for the operation and maintenance of the vessel and which would normally be sold with the vessel.

e)    "Trailer" refers to the insured vessel's trailer, used exclusively for that purpose.

f)    Words of masculine gender are deemed to encompass the female gender and vice versa. Words in the singular are deemed to encompass the plural and vice versa.

g)    "Navigational limits" means all waters as limited and shown on the declaration page unless mutually agreed by us and amended in writing.

h)    "Salvage charges" means those reasonable charges and expenses which are incurred by you if necessary to prevent damage, injury or loss of life and with our permission to prevent or minimise any further loss or damage covered by Section "A" of your insuring agreement.

i)    "Deductible" A deductible is the first amount of any claim, which must be paid by you. If a deductible is applicable to any section of your insuring agreement the amount will be shown on the declaration page and this amount shall be deducted from the amount payable on each admissible claim.

j)    "Bodily injury/property damage" means bodily injury or property damage occurring during the period of this insuring agreement arising from ownership and/or use of the vessel.

k)    "Seaworthy" means fit for the Vessel's intended purpose. Seaworthiness applies not only to the physical condition of the Hull, but to all its parts, equipment and gear and includes the responsibility of assigning an adequate crew. For a vessel to be seaworthy, it and its crew must be reasonably proper and suitable for its intended use.

l)    "Sinking" means when the vessel has sunk as far as is physically possible for the vessel to sink, and is totally submerged under water.

m)    'Family' means any person related to you by blood, marriage or adoption, including wards and foster children.

n)    'Personal Property' means property purchased and owned by you, any covered person, any member of your family, provided that such property is situated on the vessel insured hereunder at the time of the loss, excluding 'scheduled vessel' as defined in (d) above.

TLD/3/PPO/AXA                                                   Page 1 of 12

o) 'Race or speed trial' means any event involving speed and or of a competitive nature, including, but not limited to, Regattas and or Rallies. "Preparing for a race or speed trial," means any navigation of the vessel necessary to ensure eligibility of either you or your vessel to participate in a race or speed trial.

p) "Named Windstorm" damage is damage relating to or resulting from a named windstorm or any numbered tropical weather pattern from the time the "named windstorm" or numbered tropical weather pattern impacts the area and until 72 hours later.

The area of the "named windstorm" or tropical weather pattern is an area encompassed by a circle of radius not exceeding 150 nautical miles from the path of the storm's forward travel.

## 2. INSURING AGREEMENT

This is a legally binding insurance contract between you and us, incorporating in full the application form signed by you. We will provide the insurance coverage described in this insuring agreement, in return for payment to us of the premium due and compliance by covered persons with the provisions, conditions and warranties of this insuring agreement.

## 3. Coverage A, Hull, Machinery, Equipment and Dinghy

If a sum insured is shown for section "A" of the insuring agreement declaration page, we provide coverage for accidental physical loss of, or damage to scheduled vessel which occurs during the period of this insuring agreement and within the limits set out in the insuring agreement declarations page, subject to the insuring agreement provisions, conditions, warranties, deductibles and exclusions.

Reasonable expenses incurred by you in attempting to avert or minimise a loss covered by this insuring agreement will be paid by us whether successful or not. These will be paid in addition to the sum insured under section "A" and "F" without application of the insuring agreement deductible, but a coinsurance provision applies whereby we pay 80% and you pay 20% of such expenses. Our maximum liability for these expenses is 80% of the sum insured under section "A" of this insuring agreement.

We will pay salvage charges incurred by you occasioned by a peril covered by this insuring agreement, up to the limit of the sum insured under section "A" of this insuring agreement.

If the Insured vessel shall come into collision with any other ship or vessel and you, in consequence thereof, become legally liable to pay by way of damages to any other person or persons any amount not exceeding the agreed value of the vessel hereby insured, we will reimburse you such amount paid, up to the agreed value hereby insured. If your liability has been contested, and consent has been given by us in writing, we will also pay the costs thereby incurred and paid. If both vessels are to blame then, unless the liability of the owners of one or both vessels becomes limited by law, claims under this section shall be settled on the principles of cross liabilities, as if the owners of each vessel had been compelled to pay the owners of the other vessel(s) such as one half or other proportion of the latter's damages as may have been properly allowed in ascertaining the amount payable by or to you in consequence of such a collision. This principle shall apply in cases where both vessels are owned in part or in whole by you and all questions of responsibility and amount of liability between two vessels shall be left to a single Arbitrator, or if we are unable to agree upon a single Arbitrator then one shall be appointed by you and one shall be appointed by us. The two Arbitrators chosen may then choose a third Arbitrator and the decision of such single, or any two of such three Arbitrators appointed as above shall be final and binding.

In no case shall the foregoing clause extend to cover any amount you become legally liable to pay in respect of removal of obstructions under statutory powers or for injury or damages to Harbours, Wharves, Piers, Stages and similar structures consequent on such collisions, or in respect of the cargo or engagements of the Insured vessel or for loss of life or personal injury.

TLD/3/PPO/AXA                                                                    Page 2 of 12

Whilst the scheduled vessel is afloat theft coverage shall exclude theft or mysterious disappearance of its equipment or personal property unless occurring in conjunction with theft of the entire scheduled vessel or unless there is visible evidence of forcible entry and/or removal; made by tools, explosives, electricity or chemicals.

Whilst the scheduled vessel is on land, coverage is restricted to theft of the entire scheduled vessel including its equipment from a locked garage or locked storage building, or from such other storage place and subject to such other storage conditions, as we have prior approved in writing.

While the scheduled vessel is stored on a trailer coverage is restricted to theft of the entire scheduled vessel including its equipment from a locked garage or locked storage building or a locked fenced enclosure. If secured to a vehicle it must be secured with a trailer ball lock. It is understood and agreed that this insuring agreement does not cover loss or damage caused by the theft of your vessel and/or equipment while stored on a trailer unless occasioned by person or persons making forced entry into the locked fenced enclosure, garage or building and by destruction of the ball lock. Theft must be accompanied by actual force and violence of which there shall be visible marks made by tools, explosives, electricity or chemicals.

In any event a deductible of 10 % of the agreed hull value of the scheduled vessel and/or equipment is to apply to each theft loss, including total loss of the scheduled vessel. However a deductible of 5 % of the agreed hull value of the scheduled vessel shall apply to each theft loss including total loss where the scheduled vessel is stored and or moored in a recognised commercial storage yard or marina.

The deductible shown on the insuring agreement declaration page shall apply to each claim under the insuring agreement except for claims for actual and/or constructive and/or compromised total loss of the scheduled vessel and claims for expenses incurred in attempting to avoid or minimise a loss covered by the insuring agreement. theft losses as referred to above and from a named windstorm as described below.

Loss or damage to the scheduled vessel arising from a Named windstorm shall be subject to a deductible which shall apply to all claims, including Actual and/or Constructive and/or Compromised Total Loss of the insured vessel, equal to double the Hull and Machinery deductible as shown on the declaration page.

## Exclusions to Coverage A

Unless specifically agreed by us in writing and additional premium charged the following losses are not covered by this insuring agreement:

a)    Damage sustained by scheduled vessel whilst being transported over land, more than 100 miles from the normal place of storage.

b)    Losses due to wear and tear, gradual deterioration, lack of maintenance, inherent vice, weathering, insects, mould animal and marine life.

c)    Marring, scratching or denting.

d)    Osmosis, blistering or electrolysis.

e)    Manufacturing defects or design defects, including latent defects.

f)    Unrepaired damage claims if the scheduled vessel is subsequently an actual or constructive total loss, due to an insured peril, during the insuring agreement period.

g)    Losses caused directly or indirectly by ice or freezing.

h) Theft of the dinghy or tender and/or its outboard motor unless stolen together with the insured scheduled vessel from a storage place approved by us for theft coverage, or unless there is visible evidence of forcible entry and or removal made by tools, explosives, electricity or chemicals.

i) Loss and or damage to the dingy and or tender whilst being towed behind the scheduled vessel.

j) Damage to the scheduled vessel caused by theft, and/or attempted theft unless coverage would have been provided under the theft provisions and restrictions detailed in Section A.

k) Your personal expenses or those of your family including but not limited to, cost of your own labour, hotel or accommodation costs, car rental, communication costs.

l) Losses caused by delay and or loss of use and or enjoyment of the scheduled vessel and or its equipment.

## 4. Coverage B. Third Party Liability

If a sum insured is shown under section "B" of the insuring agreement declaration page, we provide coverage for any sum or sums which you or any other covered person become legally liable to pay and shall pay as a result of ownership or operation of scheduled vessel.

We will settle or defend as we deem appropriate any claims or suits brought against you, using attorneys of our choice. Our obligation to settle or defend all third party liability claims under this insuring agreement ends when the amount we pay for damages, legal expenses and removal of wreck equals the sum insured under this section of the insuring agreement.

The deductibles shown on the insuring agreement declaration page shall apply to each third party liability claim.

### Exclusions to Coverage B

Unless specifically agreed by us in writing and an additional premium paid. Liability cover is not provided for:

a) Covered persons with regard to their liability to you, other covered persons, your spouse, other members of your family or persons who reside in your household.

b) Your liability to other covered persons, your spouse, other members of your family or persons who reside in your household.

c) Liability assumed by you under any contract or agreement.

d) Liability which arises while the scheduled vessel is being transported on its own trailer or otherwise, except where the vessel is being hauled out or launched by a covered person.

e) Fines or penalties imposed by any Government agency.

f) Punitive damages.

g) Liability due to pollution by any substance whether it be gradual, or sudden and accidental.

h) Intentional acts.

i) Bodily injury or death benefits which are required to be or are covered by any State or Federal Act or Statute.

TLD/3/PPO/AXA                                                                    Page 4 of 12

j)   Bodily injury or death benefit to any persons employed by a covered person, hired as crew or not.

k)   Liability to persons being towed, or to be towed, or having been towed in the water or in the air, from the time they commence to leave the scheduled vessel, until they are safely back on board. This exclusion however shall not extend to non competitive water skiing for which limited coverage is provided below

l)   Liability to snorklers and divers operating from the scheduled vessel, from the time they commence to leave your vessel, until they are safely back on board.

m)   Liability to fare paying passengers or passengers carried under charter.

n)   Liability for damage to any marine estuary, artificial or natural reef, living or dead coral or other marine organisms, caused by the vessel or its operators or passengers.

o)   Loss or damage to any other vessel caused by the vessel insured in so far as the same would have been covered under section "A" of this insuring agreement.

p)   Liabilities, medical expenses, costs, fees or any other related expense whatsoever arising out of illness or injury in any way related to or caused by exposure to the sun or the suns rays either cumulatively or suddenly.

q)   Any claim arising from directly or indirectly caused by or associated with Human T-Cell Lymphotropic Virus type III (HILV II) or Lymphadenopathy Associated Virus (LAV) or the mutants derivatives or variations thereof or in any way related to Acquired Immune Deficiency Syndrome or any syndrome or condition of a similar kind howsoever it may be named.

## Coverage B, Water Skiing Coverage Limitation of Liability

Whilst the Insured vessel is being used for water skiing, the third party liability limits are reduced to :

| Property damage | US $10,000 |
| Bodily Injury | US $10,000 |
| Maximum any one incident | US $20,000 |

These limits shall apply from the time any person or persons begin to leave the scheduled vessel, or such activity commences, and will continue until the person or persons are safely back on board or such activity ceases completely. Nothing herein contained shall be held to vary waive or extend any of the exclusions conditions or other terms of this insuring agreement.

## Coverage B, Extension to include Crew Liability

Subject to our prior written agreement and your payment of an additional premium, we may at your request extend this insuring agreement to cover maintenance and cure and/or Jones Act Liability for hired crew. We reserve the exclusive right to set the terms, conditions and sum insured in respect of such coverage, or to decline your request.

The maximum amount recoverable in respect of crew liability claims shall be the amount shown on the insuring agreement schedule and shall form part of the maximum recoverable under Section "B", Third Party Liability.

## 5. Coverage C, Medical Payments

If a sum insured is shown under section "C" of the insuring agreement declaration page, we will pay reasonable medical and funeral expenses necessary due to accidental bodily injury of third parties, incurred whilst boarding, leaving or onboard the scheduled vessel insured under this insuring
TLD/3/PPO/AXA                                                           Page 5 of 12

agreement. These expenses must be incurred within one year from the date of the accident and will reduce any amount payable under section "B" of this insuring agreement, arising from the same occurrence.

This coverage will be excess over any other applicable insurance.

Any sum insured under this section is our maximum liability for all claims arising from any one event, regardless of the number of persons involved. Any payment made by us under this section is not an admission of liability for you or by us.

The deductible shown on the insuring agreement declarations page shall apply to each claim made under this section of the insuring agreement.

### Exclusions to Coverage C

We do not provide medical payment coverage for:

a)    Covered persons, their spouses, family or other persons who reside with them. Employees of covered persons or anyone that is or should be covered under a State or Federal Act or Statute.

b)    Responsibility assumed under any contract or agreement.

c)    Anyone injured whilst the scheduled vessel is being transported, hauled out or launched.

d)    Trespassers on the scheduled vessel. ,

e)    Anyone to or for whom benefits are payable under any Workers Compensation or under "Federal Longshoreman's and Harbour Workers Compensation Act".

## 6. Coverage D, Uninsured Boaters

If a sum insured is shown under section "D" of the insuring agreement declaration sheet, coverage is provided in respect of sums which covered persons under this insuring agreement are legally entitled to recover from a third party vessel owner or operator, but which cannot be recovered either because they have no marine liability insurance and no realisable assets or they cannot be identified, such as a hit and run operator.

The deductible shown on the insuring agreement declaration page shall apply to each claim made under this section of the insuring agreement.

The sum insured in respect of this coverage is our maximum liability for all uninsured boater claims regardless of the number of people involved and the number of claims made.

### Exclusions to Coverage D

We do not provide coverage for:

a)    Claims settled without our prior written consent.

b)    Loss due to an uninsured vessel which is a Government vessel.

c)    Loss due to a vessel operated by a covered person.

d)    Loss where no physical damage to the scheduled vessel exists, evidencing collision.

TLD/3/PPO/AXA                                                                Page 6 of 12

## 7. Coverage E, Trailer

If a sum insured is shown under section "E" of the insuring agreement declaration page, we provide coverage for accidental physical loss of or damage to the trailer if it is used exclusively for the transportation of the scheduled vessel insured under this insuring agreement, up to the sum insured.

Claims will be paid up to the limit of the sum insured, on the basis of the actual cost of repairing or replacing the trailer with a trailer of like kind and value. Depreciation due to age and wear and tear will be taken into account in calculating claims under this insuring agreement.

Reasonable expenses incurred by you in attempting to avert or minimise a loss covered by this insuring agreement will be paid by us, whether successful or not. These will be paid in addition to the sum insured under section "E" without application of the insuring agreement deductible, but a coinsurance provision applies whereby we pay 80% and you pay 20% of such expenses.

Theft of the trailer is covered if the trailer is stolen from a marina, locked garage or locked storage building, or from such other storage place and subject to such storage conditions as we have prior approved in writing.

The deductible shown on the insuring agreement declaration page shall apply to each claim under the insuring agreement except for claims for actual or constructive total loss of the scheduled vessel plus trailer and claims for expenses incurred in attempting to avoid or minimise a loss covered by the insuring agreement.

### Exclusions to Coverage E

a)    Damages sustained by scheduled vessel whilst being transported over land, more than 100 miles from the normal place of storage.

b)    Losses due to wear and tear, gradual deterioration, lack of maintenance, weathering, insects, mould animal or marine life.

c)    Marring, scratching or denting.

d)    Manufacturing defects or design defects, including latent defects.

e)    Tyre damage.

e)    Losses due to exceeding manufacturers maximum load or speed specifications.

f)    Your personal expenses or those of your family including but not limited to, cost of your own labour, hotel or accommodation costs, car rental, communication costs.

## 8. Coverage F, Personal Property

If a sum insured is shown under section "F" of the insuring agreement declaration page, we will cover direct loss or damage to personal property from any accidental cause, whilst property is onboard, being loaded onto, or unloading from the scheduled vessel. Theft losses shall only be recoverable in accordance with the conditions detailed under Section "A". Our maximum liability in respect of all claims arising from one event is the amount of the sum insured and our maximum liability for any one item, pair or set is $1,000.

Fishing gear and tackle, unless permanently affixed to the scheduled vessel, is deemed personal property.

Claims will be settled on the basis of actual cash value of personal property, less the insuring agreement deductible.

TLD/3/PPO/AXA                                          Page 7 of 12

We will not cover loss or damage to:

a)   Money, jewellery, watches, travellers cheques or any form of paper of value, furs, china,
     glass, silverware, antiques, collectibles or computer software.

b)   Fishing gear or tackle which is permanently affixed to the scheduled vessel, unless the
     scheduled vessel insured hereunder shall become an actual or constructive total loss, due to a
     peril insured against.

We will not cover losses due to:

a)   Wear and tear, gradual deterioration, inherent vice, corrosion, damage due to changes in
     humidity or temperature or mechanical or electrical failure.

b)   Breakage of articles of a brittle nature unless caused by the scheduled vessel being stranded,
     sunk, burnt, on fire, or in collision or by stress of weather, burglars or thieves.

c)   Loss of water-skis or diving equipment, unless as a result of fire, or theft following forcible
     entry, or a total loss of the scheduled vessel.

## 9. General Conditions & Warranties

a)   It is warranted that the scheduled vessel shall be used solely for private and pleasure purposes,
     and will not be used for Charter, hire lease or any other commercial activity.

b)   It is warranted that the scheduled vessel is seaworthy at the inception of the insuring
     agreement. Violation of this warranty will void this insuring agreement from its inception.

c)   This insuring agreement does not cover any loss or damage caused by your failure to exercise
     due diligence properly to manage the scheduled vessel or maintain it in a seaworthy condition.

d)   This insuring agreement incorporates in full your application for insurance and it constitutes
     the entire contract between us. At your request, various provisions of this insuring agreement
     may be varied by us but only by our prior written agreement.

e)   This insuring agreement does not cover any loss or damage which occurs after its expiration.
     However, if you have been at sea in the scheduled vessel for at least 24 hours and this insuring
     agreement expires other than due to cancellation, you may renew or reinstate the insuring
     agreement at such time as the scheduled vessel arrives safely at its next port of call and for a
     further 24 hours provided that you contact us during that 24 hours and make the necessary
     arrangements as may be required by us to renew or reinstate the insuring agreement.

f)   This insuring agreement may be cancelled by either you or us at any time, subject to 10 days
     prior written notice. If it is cancelled by us, we will pay you a pro rata return of premium. If
     it is cancelled by you, we shall pay you a short rate return of premium calculated as pro rata
     less 10%. However if a reduced premium has been charged in consideration of a period of lay
     up, the return premium will be calculated based upon the actual activity of the scheduled
     vessel, and then pro rata or short rate applied. Cancellations due to sale of the scheduled
     vessel or non-payment of premium, or non-payment of premium instalment to a premium
     financier are deemed cancellations by you. All policy fees are deemed earned at the inception
     of the policy.

g)   If you sell or pledge the scheduled vessel or otherwise transfer ownership in part or in full,
     this insuring agreement is immediately cancelled by your action unless you have our prior
     written agreement to the contrary.

h)   In the event of a claim under this insuring agreement for an actual or constructive total loss,
     the annual premium is deemed fully earned.

i)  It is hereby agreed that your brokers or any substituted brokers (whether surplus line approved or otherwise), shall be deemed to be exclusively the agents of you and not of us in any and all matters relating to, connected with or affecting this insurance. Any notice given or mailed by or on behalf of us to the said brokers in connection with or affecting this insurance, or its cancellation, shall be deemed to have been delivered to you.

j)  We need not accept or pay for any property abandoned by you. At our option however we are entitled to the salvage value of any property or equipment where we have settled a claim in full under this insuring agreement, in respect of such property or equipment.

k)  It is warranted that covered persons must at all times comply with relevant Statutes, Laws, by-laws and US Coast Guard and other regulations, governing the use of the scheduled vessel.

l)  If the scheduled vessel is fitted with fire extinguishing equipment, then it is warranted that such equipment is properly installed and is maintained in good working order. This includes the weighing of tanks once a year and recharging as necessary.

m)  If you give up your rights or our rights to recover damages from anyone who may be liable to you, denying us the benefit of the right of recovery, payment of any admissible loss under this insuring agreement shall be reduced by the amount we have been denied.

n)  This contract is null and void in the event of non-disclosure or misrepresentation of a fact or circumstances material to our acceptance or continuance of this insurance. No action or inaction by us shall be deemed a waiver of this provision.

o)  We will not pay for any loss resulting from i) radioactive contamination, or nuclear reaction ii) pollution or contamination by any substance iii) war declared or not, civil war, insurrection, rebellion, revolution or the consequences of any of these, iv) Capture, seizure, arrest, restraint or detainment by any government power or authority, lawful or otherwise.

p)  If we take steps to protect damaged or endangered property, this does not constitute acceptance of abandonment of that property by us.

q)  If any covered person has other insurance against property damage loss covered by this insuring agreement, we will only pay the proportion of the claim which our sum insured bears to the total of all the sums insured covering the loss. If this insuring agreement provides liability coverage, this insurance shall be excess over all other valid and collectible liability insurances.

r)  Unless we specifically agree in writing, and the appropriate endorsement is issued, this insurance does not cover loss or liability incurred during a race or speed trial or during preparation for a race or speed trial.

s)  Unless we agree in writing to the contrary, if we request a survey of the scheduled vessel then such survey must be received by us within 30 days of the effective date of this agreement. If the survey makes any recommendations with respect to the scheduled vessel, then it is an express warranty of this agreement that all such recommendations are completed prior to any loss giving rise to any claim hereunder, by skilled workmen using fit and proper materials and that either.

1) The surveyor who carried out the survey certifies in writing that all recommendations have been completed to his (the surveyors) satisfaction prior to any loss and/or claim

Or.

2) The workmen/repair yard that carried out the said work and/or recommendations certifies in writing that all recommendations have been completed prior to any loss and/or claim. Failure to comply with this warranty will void this agreement from inception.

t)  In no event shall this insurance cover any loss, damage, expense or liability of whatever nature, which might otherwise be recoverable under this insuring agreement arising out of or in any way connected with, whether directly or indirectly, the use or operation of any computer, computer system, computer software, programme or process or any electronic system where any such loss, damage, expense or liability arises directly or indirectly, as a consequence of a) the date change to the year 2000 or any other date change and/or b) any change or modification of or to any such computer, computer system, computer software, programme or process or any electronic system in relation to any such date change.

u)  The scheduled vessel shall be valued at the agreed valuation shown on the declaration page or on any endorsement thereto issued by us. However the following items are subject to payment on the basis of depreciated cash value less the applicable deductible .Depreciated cash value means replacement cost less the annual percentage factor of depreciation shown as follows:

A)  Internal and/or external paints, finishes, gelcoat or other covering - 10% per annum
B)  Bottom paint including but not limited to anti-foul or barrier coat finishes- 50% per annum
C)  Sails, standing and running rigging - 12.5% per annum
D)  Internal and/or external protective covers, canvas, vinyl and other materials - 20% per annum
E)  Internal and/or external upholstery, fabrics, wall coverings, carpets and rugs - 10% per annum
F)  Machinery including but not limited to engines, generators, water makers and waste systems - 7% per annum
G)  Outboard Motors - 20% per annum
H)  Outdrives, propellers, shafts, rudders, struts, couplings, trim tabs, stabilisers - 20% per annum
I)  Batteries and solar charging panels - 20% per annum
J)  Electrical equipment including but not limited to internal and external appliances, winches, pump motors and electric deck gear - 10% per annum.
K)  Mast and spars – 5% per annum.
L)  Stanchions and lifelines – 10% per annum.
M)  Inflatable, tenders or dinghies – 12.5 % per annum.
N)  Hard FRP, composites, aluminium or wood tenders or dinghies – 10% per annum.

The cost of dry docking and/or lay-days shall be adjusted in accordance with the required time to complete the repair of covered losses.

However in no event shall the depreciation value be less than 20% of the replacement cost. Reasonable labour costs to repair or replace the damaged items following a recoverable claim shall be payable in full subject always to the applicable deductible

If the hull is made in whole or in part of plywood, fibreglass, metal or other material of similar nature its repair shall be made by applying suitable patches to the damaged hull area in accordance with generally accepted good repair practice. This insuring agreement does not cover the cost or expense of painting or impregnating colour beyond the immediate damaged area or areas.

We have the right to settle any physical loss or damage claim under this insuring agreement, either by making payment to you of the estimated loss agreed between you and us, or by making repairs or replacements, like with like, for your lost or damaged property.

v)  No suit or action on this insuring agreement for the recovery of any claim shall be sustainable in any court of law or equity unless the Assured shall have fully complied with all the requirements of this Insuring agreement, nor unless commenced within one (1) year from the date of the happening or the occurrence out of which the claim arose, provided that where such limitation of time is prohibited by the laws of the state wherein this Insuring agreement is issued, then, and in that event, no suit or action under this Insuring agreement shall be

TLD/3/PPO/AXA                                      Page 10 of 12

sustainable unless commenced within the shortest limitations permitted under the laws of such state.

w) Where a lay up "laid up period" has been specified within the declaration page, it is warranted that the scheduled vessel will not be used, navigated or utilised, in any manner whatsoever, during the dates so specified. "Use" includes, but is not restricted to, living on board the scheduled vessel.

## 10. Your Duties In The Event Of A Loss

1) Immediately take all possible steps to minimise the loss and protect the scheduled vessel from further loss. Failure to do so may invalidate your insurance coverage or reduce the amount of any claim hereunder.

2) As soon as possible give us notification of the loss and its circumstances.

3) Comply with any reasonable request made of you, by us with regard to the loss.

4) Advise the Police, Coast Guard, or any appropriate authority of the loss and its circumstances.

5) Give us an opportunity to examine the damaged property before it is repaired or discarded.

6) Submit a claim form and/or statement describing the loss, together with two estimates of repair cost and/or records to substantiate the amount of the loss.

7) Neither assume obligation, nor admit liability without our written permission to do so.

8) Immediately forward to us any legal papers or notices received in connection with the loss.

9) Cooperate with us in the investigation, defence or settlement of any loss and agree to be examined under oath if we so request

10) Allow examination by physicians of our choice.

11) Assist us in obtaining copies of medical records and reports.

12) Give us a notarised statement or statutory declaration if we so request.

13) Give us a proof of loss and discharge of liability once the amount of the claim under this insuring agreement has been agreed with you.

14) Preserve any right of recovery from others. When we pay a loss, your right to recover becomes ours up to the amount of our payment together with any legal fees and expenses You must also co-operate with us to recover the losses we may pay. Any amounts recovered from others belong to us up to the amount of our payment together with any legal fees and expenses.

## 11. Service Of Suit Clause

It is agreed that in the event of the failure of the Underwriters severally subscribed to this insurance (The Underwriters) to pay any amount claimed to be due hereunder, the Underwriters, at the request of the Assured, will submit to the jurisdiction of a court of competent jurisdiction within the United States of America.

Notwithstanding any provision elsewhere in this insurance relating to jurisdiction, it is agreed that the Underwriters have the right to commence an action in any court of competent jurisdiction in the United States of America, and nothing in this clause constitutes or should be understood to constitute a waiver of the Underwriter's right to remove an action to the United States Federal District Court or to seek remand therefrom or to seek a transfer of any suit to any other court of competent jurisdiction as permitted by the laws of the United States of America or any state therein.
TLD/3/PPO/AXA                                                    Page 11 of 12

Subject to the Underwriters rights set forth above:

a) It is further agreed that the Assured may serve process upon any senior partner in the firm of:

> LeBoeuf, Lamb, Greene & MacRae LLP
> 125 West 55th Street
> New York
> NY 10019-5389

and that in any suit instituted against any one of them upon this contract the Underwriters will abide by the final decision of the Court or any Appellate Court in the event of an appeal.

b) The above named are authorised and directed to accept service of process on behalf of Underwriters in any such suit and/or upon request of the Assured to give written undertaking to the Assured that they will enter a general appearance upon the Underwriters behalf in the event such a suit shall be instituted.

c) The right of the Assured to bring suit as provided herein shall be limited to a suit brought in its own name and for its own account. For the purpose of suit as herein provided the word Assured includes any mortgage under a ship mortgage which is specifically named as a loss payee in this insurance and any person succeeding to the rights of any such mortgage.

d) Further, pursuant to any Statute of any State, Territory or District of the United States of America which makes provision therefore, Underwriters hereby designate the Superintendent, Commissioner or Directors of Insurance or any other officer specified for that purpose in the statute, or his successor or successors in office (The Officer) as their true and lawful attorney upon may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above named as the person to whom the Officer is authorised to mail such process or true copy thereof.

Clause 11 above is subject, in all respects to clause 12 hereafter.

## 12. CHOICE OF LAW

It is hereby agreed that any dispute arising hereunder shall be adjudicated according to well established, entrenched principles and precedents of substantive United States Federal Admiralty law and practice but where no such well established, entrenched precedent exists, this insuring agreement is subject to the substantive laws of the state of New York.

TLD/3/PPO/AXA

Page 12 of 12

TOTAL P.28

**EXHIBIT "D"**

OFFENSE/INCIDENT REPORT

| Agency ORI Number | Agency Name | Agency Report Number | 1. In Report | 2. Supplement |
|---|---|---|---|---|
| no. 4 4 0 0 0 0 | OFFICE OF SHERIFF, MONROE COUNTY, FLORIDA | 9 9 3 | 7 9 6 2 | |

**EVENT DATA**

Original Day Reported: SAT 1/13/99 Time 13:52
Time Dispatched Time Arrived Time Completed

Incident Type: 1 Felony / 4 Traffic / 7 Misdemeanor / 8 Other — From SUN 11/07/99 1200 to 1:AT 11/13/99 1300 NCIC/UCR Code

OFFENSE Type Description
#1 GRAND THEFT (VESSEL) — A-Attempted / C-Committed — C 8 2 1-0 1 4

#2

Incident Location (Street, Apt Number): 165 W. Plaza Tr. Tavernada City Zip 33036 District 3 Grid 6000 Shift 01 Zone 01

Business Name/Area Identifier: FORD ANTIGUA
Current Entry: O-N/A N-No
Occupancy: 0 N/A / 1 Occupied / 2 Unoccupied / 3 Abandoned — 2

**Location Type**
01 Residence-Single / 02 Apartment/Condo / 03 Residence Other / N Hotel/Motel / 05 Convenience Store / 06 Gas Station / 07 Liquor Sales / 08 Bar/Nightclub / 09 Supermarket / 10 Dept/Discount Store / 11 Specialty Store / 12 Drug Store/Hospital / 13 Bank/Financial Inst. / 14 Commercial/Office Bldg / 15 Industrial/Mfg / 16 Storage / 17 Gov't/Public Bldg / 18 School/University / 19 Jail/Prison / 20 Religious Bldg / 21 Airport / 22 Bus/Rail Terminal / 23 Construction Site / 24 Other Structure / 25 Parking Lot/Garage / 26 Highway/Roadway / 27 Park/Woods/Field / 28 Lake Waterway — 99

| #OFFENSE | # Victims | # Offending | # Prem Ent | # Veh. Stolen | Type Weapon | Type | 05 Knife/Cutting | 07 Hands/Fists/Feet | 10 Fire/Incendiary | 13 Drugs | |
| | 01 | Unk | 00 | 00 | 00 Rifle / 01 Handgun | 02 Rifle / 03 Shotgun / 04 Firearm | Instrument / 06 Blunt Object | 08 Poison / 09 Explosives | 11 Threat/Intimidation / 12 Simulated Weapon | 88 Unknown / 99 Other | 0.0 |

**CODES**

Activity: P Possess / S Sell / B Buy / T Traffic / R Smuggle
D Deliver / E Use / K Dispense/Distribute / M Manufacture/Produce/Cultivate / U Unknown / Z Other
Type: A Amphetamine / B Barbiturate / C Cocaine / E Heroin / H Hallucinogen / M Marijuana / O Opium/Derivative / P Paraphernalia / Equipment / S Synthetic
U Unknown / Z Other
Unit: 1. Gram / 2. Milligram / 3. Kilogram / 4 Ounce / 5 Pound / 6. Ton / 7. Liter / 8. Milliliter / 9 Dose Unit/Item

**DRUGS**

| | Activity | Type | Description | Quantity | Unit | Estimated Street Value | |
| | | | | | | $ | 00 |
| | | | | | | $ | 00 |
| | | | | | | $ | 00 |

**CODES**

V/W Code: V-Victim / W-Witness / C-Reporting Person
Victim Type: P Proprietor / X-Other / 1 Juvenile / 2 LE Officer / 3 Adult / 4. Business / 5. Government / 6 Church / 9. Other
Race: N N/A / W White / B-Black / I American Indian / O Oriental/Asian / U Unknown
Sex: N N/A / M Male / F Female / U-Unknown
Residence Type: 0 N/A / 1. City / 2. County / 3. Florida / 4 Out-of-State
Residence: O N/A / P Part Time / N Non-Resident
Extent of Injury: N None / M Minor / S Serious / F Fatal

Injury Type: 01 N/A / 02 Apparent Minor / 03 Possible Internal / 04 Unconscious / 05 Poss. Broken Bones / 06 Poss. Internal Injury — 07 Loss of Teeth / 08 Burns / 09 Abrasions/Bruises / 99 Other
Victim Relationship To Offender: A Parent / B Spouse / C Child / H Friend / E In-Law / F-Common Law / G Boy/Girl Friend / J-Employee / K-Landlord/Tenant / L-Stranger / M-Undetermined / N-Ex Spouse / O Step-Parent
P-Step Child / Q-Other Family / R-Stepchild / S-Teacher
T Child/Boy-Girl Friend / U Neighbor / V-Sitter/Day Care Worker / W-Employer / X-Acquaintance / Y-Other Unknown / Z-N/A

**VICTIM/WITNESS**

| OFF/INC Indicator | V/W Code | # | V. Type | Name (Last, First, Middle or Business) | | Residence Phone |
| 1 #1 3 Both | V | | 3 | CARRL, FRANK | | 305 664-0539 |
| 2 #2 | | | | | | |
| Address (Street, Apt No.) | | | | | | Business Phone |
| 461 Plaza Tr Largo | | | | Tavernada FL | 33036 | 305 664-7948 |

Other Contact Info (Time Available, Interpreter, etc.): 165 W. Plaza Cir. Miami Bch 33141
Synopsis of Involvement: VICTIM

| V/W Code | Race | Sex | Date of Birth or Age | Res. Type | Res. Status | Extent of Injury | Injury Type(s) | Relationship | Will victim prefer charges? |
| V, W, C, or P | M | | 7.4.44 | 3 | | N | 0.0 | Y | Yes ☑ No ☐ |

OFF/INC Indicator / V/W Code / # / V. Type / Name (Last, First, Middle or Business) — Residence Phone
1 #1 3 Both / 2 #2

| Address (Street, Apt No.) | | City | State | Zip | Business Phone |

Other Contact Info (Time Available, Interpreter, etc.) — Synopsis of Involvement

| V/W Code | Race | Sex | Date of Birth or Age | Res. Type | Res. Status | Extent of Injury | Injury Type(s) | Relationship | Will victim prefer charges? Yes ☐ No ☐ |

OFF/INC Indicator: 1 #1 3 Both / 2 #2
Suspect Code: S-Suspect / A-Arrestee — F-Escapee / Z Other — Code # / Juvenile / Name (Last, First, Middle) — Nickname/AKA — Number Arrested / In-Book #

Last Known Address (Street, Apt Number) — City / State / Zip / Residence Phone

**SUSPECT**

| Race | Sex | Date of Birth or Age | Height | Weight | Eye Color | Hair Color | Hair Length | Hair Style | Texture |
| Complexion | Build | Glasses | Facial Hair | Teeth | Speech/Voice | Clothing | Appearance | Physical Cond. Scars/Marks/Tattoos (Location/Describe) | Hand Use ☐ Left ☐ Right ☐ Unknown |

OFF/INC Indicator: 1 #1 3 Both / 2 #2
Suspect Code: S-Suspect / A-Arrestee — F-Escapee / M Missing / R-Runaway / Z-Other — B Missing/Harmed / Code # / Juvenile / Name (Last, First, Middle) — Nickname/AKA — In-Book #
Last Known Address (Street, Apt Number) — City / State / Zip / Residence Phone

**3. SPCT OR MISSING PERSON**

| Race | Sex | Date of Birth or Age | Height | Weight | Eye Color | Hair Color | Hair Length | Hair Style | Texture |
| Complexion | Build | Glasses | Facial Hair | Teeth | Speech/Voice | Clothing | Appearance | Physical Cond. Scars/Marks/Tattoos (Location/Describe) | Hand Use ☐ Left ☐ Right ☐ Unknown |

**COMPLEXION**: Alb. - Albino / Blk - Black / Cmp - Complexion / Drk - Dark / Fair - Fair / Lbn - Light Brown / Lht - Light / Med - Medium / Olv - Olive / Rud - Ruddy / Sal - Sallow / Yel - Yellow

**BUILD**: A Heavy/Fat / B Medium / C Thin / D Muscular / X Other (specify in narrative) / Y Not Applicable / Z Unknown

**GLASSES**: A Rim Glasses / B Plastic Frames / C Wire Frames / D Rimless / E Sunglasses / F Tinted Lenses / X Other (specify in narrative) / Y Not Applicable / Z Unknown

**FACIAL HAIR**: A Clean Shaven / B Unshaven / C Heavy Brows / D Sideburns / E Fuzzy / F Mustache / G Full Mustache / H Lower Lip Hair / I Goatee / J Thin Beard / K Full Beard / X Other (specify in narrative) / Y Not Applicable / Z Unknown

**TEETH**: A Broken/Chipped / B Missing / C None / D False/Dentures / E Braces / F Capped / G Irregular / H Protruding / I Stained/Decayed / J Gold / K Other / X Other (specify in narrative) / Y Not Applicable / Z Unknown

**SPEECH**: A Accent / B Lisp / C Slurred / D Stuttered / E Nasal / F Mumbled / G Rapid / H Slow / I Pleasant — **HAIR TEXTURE**: A Coarse / B Fine / C Shaved / D Thick / E Thinning / J Talkative / K Quiet / L Soft Nothing/Monotone / M Profane / N Broken / O Effeminate / X Other (specify in narrative) / Y Not Applicable / Z Unknown

**SPEECH F**: Wig / G Kinky / X Other (specify in narrative) / Y Not Applicable / Z Unknown

**CLOTHING**: A Baseball Cap / B Watch Cap / C Other Cap / D Cowboy Hat / E Other Hat / F Headband/Scarf / G Ski Mask / H Stocking Mask / I Earrings/Jewelry / J Shirt/Blouse / K Shorts / L Pants / M Skirt

N Dress / O Sweater / P Jacket / Q Coat / R Uniform / S Coveralls / T Suit / U Bathing Suit / V Gloves / W Boot/Shoes / Footwear / X Other (specify in narrative) / Y Not Applicable / Z Unknown

**APPEARANCE**: A Conservative / B Dirty / C Flashy / D Neat / E Military / F Unkept / G Unusual Odor / H Well Groomed / I Work Clothes / X Other (specify in narrative) / Y Not Applicable / Z Unknown

**HAIR LENGTH**: A Bald / B Collar / C Long / D Receding / E Shoulder / F Short / X Other (specify in narrative) / Y Not Applicable / Z Unknown

**PHYSICAL CONDITION**: A Handicapped / B Intoxicated / C High/On Drugs / X Other (specify in narrative) / Y Not Applicable / Z Unknown

**HAIR STYLE**: A Afro/Natural / B Braided / C Bushy / D Crew Cut / E Greasy / F Military / G Pony Tail / H Processed / I Straight / J Wavy/Curly / K Wig / L Dyed / X Other (specify in narrative) / Y Not Applicable / Z Unknown

OPS-001-6/99

cv-00388-KMM Document 52 Entered on FLSD Docket 06/29/2001 Page

## OFFICE OF SHERIFF, MONROE COUNTY, FLORIDA

| | | | | | | Photo Available? | Dental Record Available | MCIC Form Provided? |
|---|---|---|---|---|---|---|---|---|

**MISSING PERSON/PLATE**

| Incident Type | 6 Disaster | Foul Play Suspected? | Missing Before? | Fingerprints Available? | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 Runaway | Victim | | | | | | | |
| 2 Parental | 7 Voluntary | Y - Yes | Y - Yes | Y - Yes | Y - Yes | Y - Yes | Y - Yes | Y - Yes |
| 3 Involuntary | Adult | N - No | N - No | N - No | N - No | N - No | N - No | N - No |
| 4 Disabled | 8 Unknown | | U - Unknown | U - Unknown | U - Unknown | U - Unknown | U - Unknown | |
| 5 Endangered | | | | | | | | |

Date Last Seen / Time Last Seen / Location Last Seen (Address, City, St) / Accompanied By

Mental/Physical Condition / Medication Required/Type / Doctor/Dentist (Name, Phone Number)

Property Carried / ID Type/Number / ID Type/Number

Probable Destination / Name/Address / Transportation Mode

**Recovery Information**

| 0 N/A | 2 Located | 3 Hospitalized | 5 Law Enforcement Custody | 7 Deceased |
|---|---|---|---|---|
| 1 Voluntary | Not Returned | 4 HRS Custody | 6 Returned to Parent | 9 Other |

**VEHICLE/VESSEL**

Person Code / Veh. # / Status / Damage / Type **7** / Year **89** / Make / Model / Style

Tag Reg/Dec. # / Reg. State / Reg. Year / Decal Number / Tag Type

VIN/HIN/VIN#  **M P C . 3 . 9 0 . 2 . 4 A. 9.8.9**  Estimated Value **1 0 . 0 . 0 . 0 . 0 . 0 | 00**

| Condition | Insurance Company | Lien Holder |
|---|---|---|
| 1 Window Closet □ 3 Keys in Ignition | T L. Dallas | STERLING BANK |
| □ 2 Locked | | |

Color (Top/Bottom) **White / Blk** / Description (Identifying Characteristics, Noticeable Damage, Interior Color, etc.) Name "THE FLUR of US" (IR14 #1 FL.63826T)

Vessel Name **Mainship** / Length **39'** / Hull Material **Fiberglass** / Propulsion **Inboard Diesel** / Boat Type **Cabin Cruiser**

Recovery Address/Geographic Indicator / Date Recovered / Value Recovered | 00

| Recovery N/A | Recovery Code | Original Reporting Agency | Report Number | Held Y-Yes N-No | Reason/Authority |
|---|---|---|---|---|---|

**Method of Theft** □ 0 N/A □ 2 Tow Truck □ 4 Slaving □ 5 Ignition Punch □ 7 Unknown □ 1 Keys □ 3 Hot Wire □ 8 Unknown

Towed By / Storage Location / FCIC/NCIC / Location of Original Theft / Vehicle Acquisition #

**THEFT**

| Type of Theft | | | | | 09 From Vehicle | 11 By Computer | 99 Other |
|---|---|---|---|---|---|---|---|
| 00 N/A | 02 Robbery | 04 Pocket Picking | 06 Embezzlement | 08 From Public | 10 Extortion | 12 Fraud | **9.9** |
| 01 Burglary | 03 Shoplifting | 05 Purse Snatching | 07 From Coin Oper. Machine | Access Bldg | | | |

**PROPERTY**

Person Code # / Item # / Status / Damage / Property Type / Quantity **01** / Name **Boat** / Brand **Mainship** / Model Name/Number **TI Biberglass**

Serial Number **MPR: 3A014A989** / Owner Applied Number **C1 6382GT** / Description (Size, Color, Caliber, Barrel Length, etc.) **White w/ Blk Bottom** / Property Receipt #

Value **D.D.D.D.D.0 . 0 | $** / Value Recovered / Date Recovered / FCIC/NCIC

Person Code # / Item # / Status / Damage / Property Type / Quantity / Name **Picture** / Brand **Color** / Model Name/Number

Serial Number / Owner Applied Number / Description (Size, Color, Caliber, Barrel Length, etc.) **Picture of vessel that was stolen** / Property Receipt # **607283**

Value / Value Recovered **. . 0 | $** / Date Recovered **/ /** **3 . 9 . 9** / FCIC/NCIC

**DOCUMENT**

Vic # / Wit # / Susp # / Der # / Status / Type / Bank/Card Issuer / Account Number / Document/Serial No.

Printed Name / Payable To / Face Signature

Endorsement / Other Name(s) / Service/Property Received

ID Type / ID Number / Document Date / Amount | $ | 0 . 0

DPS 002-8/88

| | | 1. Offense | 2. Arrest | Juvenile | 1. Original | 2. Supplement | Page | of |
|---|---|---|---|---|---|---|---|---|

**Agency ORI Number** 
FL0 4 4 0 0 0 0

**Agency Name**
OFFICE OF SHERIFF, MONROE COUNTY, FLORIDA

**Agency Report Number**
7 4 3 1 6 9 6 2

**Original Date Reported / Case Reference**
1 1 2 1 3 9 9

ON THE ABOVE LISTED DATE AND TIME I RESPONDED TO THE ABOVE

LISTED LOCATION IN REPORT OF THE THEFT OF A VESSEL. UPON ARRIVAL, I

MADE CONTACT WITH ABOVE LISTED VICTIM WHO RELATED TO ME THAT BETWEEN

THE INDICATED DATES AND TIMES, UNKNOWN PERSON OR PERSONS REMOVED HIS

39' FOOT MAINSHIP CABIN CRUISER TYPE VESSEL FROM HIS DOCK BEHIND THE

INDICATED ADDRESS. VICTIM STATES THAT VESSEL HAD ALL TYPES OF ELECTRONICS

INSTALLED IN IT, I.E: RADAR, DEPTH RECORDERS, MARINE RADIOS (VHF), STEREO,

T.V., VCR, MICROWAVE, ETC. VICTIM ALSO STATED THAT IT HAD YANMAR

DIESEL ENGINES ALONG WITH A GENERATOR. VESSEL IS WHITE WITH BLACK BOTTOM.

VESSEL: 39' MAINSHIP CABIN CRUISER

DESCRIPTION: WHITE FIBERGLASS HULL WITH BLACK BOTTOM, ALUMINUM TUNA TOWER

WITH BLACK CANVAS TOP ON TOWER. DUAL STATION CONTROLS

POWER: TWIN INBOARD DIESEL YANMAR 300 HP ENGINES. ALONG WITH YANMAR

GENERATOR.

LOCATION WHERE TAKEN: FROM DOCK BEHIND RESIDENCE. VESSEL WAS DOCKED AND TIED

WITH NUMEROUS ROPES AND DOCK FENDERS. ONE DOCK FENDER WAS LEFT AND

SEVERAL DOCK LINES WERE TAKEN ALONG WITH VESSEL. VESSEL WAS ALSO CONNECTED

TO SHORE POWER, CABLE ALSO TAKEN. VESSEL WAS IN CANAL ON CORNER OF

PONCE DE LEON AND W. PLAZA DE LAGO

EVIDENCE: NO EVIDENCE WAS VISIBLE AT THIS TIME. HOWEVER THE OUTLET WHICH THE

SHORE POWER CABLE WAS CONNECTED TO WAS PULLED OUT OF THE WALL AND

LEFT UNSECURED.

AREA CANVAS: AN AREA CANVAS WAS CONDUCTED OF THE FOLLOWING. # 4B-52-60

IN PLAZA DE LAGO TO WHICH REVEALED NO FURTHER INFORMATION. HOWEVER

ON W PLAZA GRENADA, SEVERAL RESIDENCE WERE ATTEMPTED TO BE LOCATED

BUT NO ONE WAS HOME AT THE TIME.

NOTIFICATION: FMP WAS NOTIFIED BY VICTIM PRIOR TO MY ARRIVAL AND

COAST GUARD WAS NOTIFIED BY OUR DISPATCH AND ALSO ENTERED IN

FCIC & NCIC. A PICTURE OF VESSEL WAS ALSO PLACED INTO EVIDENCE

UNLESS ON SCENE. INV N. SANCHEZ

| Report Contains | | | | Related Report Number(s) |
|---|---|---|---|---|

**Officer(s) Reporting**
Dep. N. Sanchez  I.D. Number(s) 8147/335  Unit 03  Date 11/13/99

**Officer Reviewing (If Applicable)**  ID Number 462 C  Routed To / Referred To / Assigned To / By / Date

| Case Status | Clearance Type | Date Cleared | Arrest Number | | Number Arrested |
|---|---|---|---|---|---|
| | 1 Arrest / 2 Exceptional / 3 Unfounded | A Adult / J Juvenile | | | |

| Exception Type | | | | | OBTS Number |
|---|---|---|---|---|---|
| 1 Extradition Declined | 2 Arrest on Primary Offense Secondary Offense | 3 Death of Offender / 4 V/W Refuses to | 5 Prosecution Declined / 6 Juvenile / No Custody | | |

**PROPERTY RECEIPT**

## OFFICE OF THE SHERIFF, MONROE COUNTY

| FOR PROPERTY DIVISION USE ONLY | | DISPOSITION | | CASE NUMBER 67283 |
|---|---|---|---|---|

| | | [ ] FOUND / RECOVERED | DISPOSITION | |
|---|---|---|---|---|
| DATE IMPOUNDED 11-13-99 | | [ ] LAB EVIDENCE | [ ] HOLD - SUBJECT UNKNOWN [X] HOLD - CHARGES FILED | [ ] CONFISCATE / DESTROY [ ] RETURN TO OWNER / FINDER |
| TIME IMPOUNDED 1144 | | [X] TRIAL EVIDENCE | PRIMARY CHARGE GRAND THEFT | [X] FELONY [ ] MISDEMEANOR |

993/6962

ADDRESS WHERE PROPERTY IMPOUNDED (Give exact location)
C W 17.80 LE CAYO                    S Stinson ADA      Lar: HN'16wn

| DISCOVERED BY (Name) | ADDRESS | CITY | STATE | TELEPHONE NUMBER |
|---|---|---|---|---|
| Dep N. SANCHEZ | 59770 O/S Hwy | AVENNEM | 33010 | (305)-53-3211 |

| NAME | | | ADDRESS | | CITY | | STATE | | TELEPHONE NUMBER |
|---|---|---|---|---|---|---|---|---|---|

| OWNER [ ] | ARRESTED [ ] | OBTS # | | RACE | SEX | DOB | WARRANT YES [ ] NO [ ] |
|---|---|---|---|---|---|---|---|
| VICTIM [ ] | SUSPECT [ ] | | | | | | |
| NAME | | ADDRESS | | CITY | | STATE | TELEPHONE NUMBER |

| OWNER [ ] | ARRESTED [ ] | OBTS # | | RACE | SEX | DOB | WARRANT YES [ ] NO [ ] |
|---|---|---|---|---|---|---|---|
| VICTIM [ ] | SUSPECT [ ] | | | | | | |

| BAR CODE | ITEM # | QTY. | DESCRIPTION |
|---|---|---|---|
| | 1 | 1 | DELUXE BRAND - THER /Color /Registration number of Vessel that was stolen |
| | | | No other property |

COMMENTS:

**LABORATORY ANALYSIS REQUEST**

| | | | | |
|---|---|---|---|---|
| [ ] CHEMISTRY | [ ] LATENTS | [ ] DOCUMENTS | [ ] SEMEN AND / OR STAINS | [ ] TRACE EVIDENCE | [ ] PHOTOGRAPHIC |
| [ ] DRUGS | [ ] FIREARMS | [ ] TOOLMARKS | [ ] BLOOD AND / OR STAINS | [ ] BIOLOGY - SEROLOGY | [ ] OTHER |

Special Analysis requested (if any, specify):, Additional Evidence will follow (specify): ___

I hereby acknowledge that the above list represents all property taken from my possession and that I have received a copy of this receipt.

I hereby acknowledge that the above list represents all property impounded by me in the official performance of my duty as a Deputy Sheriff.

Impounding Officer (X) Dep. T. Govin Dep. N. Sanchez

| Signature (X) | Division / Agency MCSO | I.D. # 8147/335 |
|---|---|---|
| Received By | Reason | Date / Time Received |
| Received By | Reason | Date / Time Received |
| Received By | Reason | Date / Time Received |
| Received By | Reason | Date / Time Received |
| | Reason | Date / Time Received |

Copy #1 - Evidence / Property File   Copy #2 - Chain of Custody   Copy #3 - Records   Copy #4 - Station Property File   Copy #5 - Property Received / Custody Receipt

**EXHIBIT "E"**



# UNITED STATES OF AMERICA

## DEPARTMENT OF TRANSPORTATION
## UNITED STATES COAST GUARD

HIN: MPC39024A989

# Certificate of Documentation

| VESSEL NAME | | | OFFICIAL NUMBER | | HAILING PORT | |
|---|---|---|---|---|---|---|
| THE FOUR OF US | | | 959827 | | MIAMI BEACH FL | |
| GROSS | NET | LENGTH | BREADTH | DEPTH | HULL MATERIAL | SELF PROPELLED |
| 23 | 19 | 39.1 | 14.0 | 6.5 | FRP | YES |

| PLACE BUILT | YEAR BUILT |
|---|---|
| MARLBORO, NEW JERSEY | 1989 |

| OWNER | OPERATIONAL ENDORSEMENTS |
|---|---|
| YOLA PIERRE | RECREATION |

**COMPLETE RECORDS ON FILE AT:** MIAMI, Fl

**MANAGING OWNER**

YOLA PIERRE
1640 DAYTONIA ROAD
MIAMI BEACH, FL 33141

**RESTRICTIONS**

NONE

PLAINTIFF'S
EXHIBIT
#6
RWP 5-11-01

**ENTITLEMENTS**

NONE

**REMARKS**

NONE

THIS CERTIFICATE MAY NOT BE ALTERED EXCEPT BY AFFIXING OFFICIAL RENEWAL AND ADDRESS CHANGE DECALS ON THE REVERSE.

| ISSUED AT | SIGNATURE AND SEAL |
|---|---|
| MIAMI, FL | *Dorothy S. Montague* |

**ISSUE DATE** JULY 28, 1995

THIS CERTIFICATE EXPIRES ON THE LAST DAY OF __JUL 96__
UNLESS RENEWED BY DECAL ON REVERSE. DGM

DOROTHY G. MONTAGUE
DOCUMENTATION OFFICER

PREVIOUS EDITION OBSOLETE

SN 7530-01-GF2-9670

EXHIBIT "F"

| DEPARTMENT OF TRANSPORTATION U.S. COAST GUARD CG-1258 (REV. 9-92) | APPLICATION FOR INITIAL ISSUE, EXCHANGE, OR REPLACEMENT OF CERTIFICATE OF DOCUMENTATION; REDOCUMENTATION | | THIS SECTION FOR COAST GUARD USE ONLY |
|---|---|---|---|
| | | | CASE NUMBER: 9500 8824 |
| | | | CHECK #: 92 31 |
| | | | FEE: $ 108.00 - CB |

NOTE. THIS IS AN APPLICATION ONLY AND DOES NOT OF ITSELF ENTITLE A VESSEL TO DOCUMENTATION NOR TO ANY CHANGES SOUGHT ON A CERTIFICATE OF DOCUMENTATION. OFFICIAL NUMBERS DESIGNATED ON THE BASIS OF THIS APPLICATION ARE NOT TRANSFERRABLE. A COPY OF THIS APPLICATION IS NOT VALID FOR VESSEL OPERATION.

**IPN:** 95021864

## I. COMPLETE FOR ALL APPLICATIONS

**PORT OF RECORD**

| A. VESSEL NAME | B. OFFICIAL NUMBER (IF AWARDED) OR HULL IDENTIFICATION NUMBER | |
|---|---|---|
| THE FOUR OF US | 959827 | APPROVED: Dorothy B. Mabarger DATE: 7-27-95 PORT: m.n vb |

| C. NAME OF MANAGING OWNER | D. ADDRESS OF MANAGING OWNER |
|---|---|
| YOLA PIERRE | 1640 Daytonia Rd. Miami Beach, Fla. 33141 |

**TELEPHONE NUMBER (OPTIONAL):**

**SOCIAL SECURITY OR TAX ID NUMBER**

| E. NAMES AND SOCIAL SECURITY OR TAX ID NUMBERS OF ALL OTHER OWNERS | F. MAILING PORT (TO BE MARKED ON VESSEL) |
|---|---|
| n/a | MIAMI BEACH, FLA. |

ATTACH SHEET LISTING ADDITIONAL OWNERS IF NECESSARY

**G. CITIZENSHIP** (SEE INSTRUCTIONS REGARDING STATUS OF ALIENS LAWFULLY ADMITTED FOR PERMANENT RESIDENCE)

XXXX VESSEL OWNED BY ONE OR MORE INDIVIDUALS. ☐ I (WE) CERTIFY THAT ALL OWNERS OF THIS VESSEL ARE CITIZENS OF THE UNITED STATES.

☐ VESSEL OWNED BY JOINT VENTURE OR ASSOCIATION — I (WE) CERTIFY THAT ALL MEMBERS OF THIS JOINT VENTURE (ASSOCIATION) ARE CITIZENS OF THE UNITED STATES. ELIGIBLE TO DOCUMENT THE VESSELS COVERED BY THIS APPLICATION WITH THE ENDORSEMENT(S) SOUGHT IN THEIR OWN RIGHT.

☐ VESSEL OWNED IN A TRUST ARRANGEMENT — I (WE) CERTIFY THAT ALL TRUSTEES AND ALL BENEFICIARIES WITH AN ENFORCEABLE INTEREST IN THIS TRUST ARRANGEMENT ARE CITIZENS OF THE UNITED STATES, ELIGIBLE TO DOCUMENT VESSELS WITH THE ENDORSEMENT(S) SOUGHT IN THEIR OWN RIGHT.

☐ VESSEL OWNED BY A PARTNERSHIP
A. GENERAL PARTNERSHIP

I (WE) CERTIFY THAT ALL PARTNERS IN THIS PARTNERSHIP ARE CITIZENS OF THE UNITED STATES. ELIGIBLE TO DOCUMENT VESSELS IN THEIR OWN RIGHT, AND THAT THE PARTNERSHIP MEETS THE FOLLOWING EQUITY REQUIREMENT: EQUITY OWNED BY CITIZENS OF THE U.S.
☐ AT LEAST 50%   ☐ MORE THAN 50%, LESS THAN 75%   ☐ 75% OR MORE

B. LIMITED PARTNERSHIP

I (WE) CERTIFY THAT ALL GENERAL PARTNERS IN THIS PARTNERSHIP ARE CITIZENS OF THE UNITED STATES, ELIGIBLE TO DOCUMENT VESSELS IN THEIR OWN RIGHT AND THAT THE PARTNERSHIP MEETS THE FOLLOWING EQUITY REQUIREMENTS. EQUITY INTEREST OWNED BY CITIZENS OF THE U.S. ELIGIBLE TO DOCUMENT VESSELS IN THEIR OWN RIGHT WITH THE ENDORSEMENT SOUGHT.
☐ AT LEAST 50%   ☐ MORE THAN 50%, LESS THAN 75%   ☐ 75% OR MORE

☐ VESSEL OWNED BY A CORPORATION

A. STATE OF INCORPORATION

B. CITIZENSHIP OF PRESIDENT AND OTHER CHIEF EXECUTIVE OFFICER, IF ANY

C. CITIZENSHIP OF CHAIRMAN OF THE BOARD

D. NUMBER OF DIRECTORS NECESSARY TO CONSTITUTE A QUORUM

E. NUMBER OF ALIEN DIRECTORS

F. PERCENTAGE OF STOCK OWNED BY U.S. CITIZENS ELIGIBLE TO DOCUMENT VESSELS IN THEIR OWN RIGHT, WITH THE ENDORSEMENT(S) SOUGHT ON THIS APPLICATION (APPLIES TO ALL TIERS OF OWNERSHIP)
☐ LESS THAN 50%   ☐ AT LEAST 50%   ☐ MORE THAN 50%, LESS THAN 75%   ☐ 75% OR MORE

☐ VESSEL OWNED BY A CORPORATION QUALIFIED AND APPLYING UNDER 46 CFR 68.01 (BOWATER)

CURRENT CERTIFICATE OF COMPLIANCE ATTACHED. I (WE) CERTIFY THAT THE CORPORATE STRUCTURE HAS NOT CHANGED SINCE ISSUANCE OF THAT CERTIFICATE, AND THAT THE VESSEL IF SELF-PROPELLED, IS LESS THAN 500 GROSS TONS.

☐ VESSEL OWNED OR OPERATED BY NOT-FOR-PROFIT OIL RECOVERY COOPERATIVE

COPY OF CURRENT LETTER OF QUALIFICATION ATTACHED. I (WE) CERTIFY THAT THE INFORMATION ON FILE WITH REGARD TO COOPERATIVE AND ISSUANCE OF THAT LETTER REMAINS UNCHANGED.

**H. ENDORSEMENTS FOR WHICH APPLICATION IS MADE.** (IF MORE THAN ONE, INDICATE ESTIMATED PERCENTAGE FOR EACH)

| ☒ RECREATIONAL | ☐ COASTWISE | ☐ FISHERY | ☐ COASTWISE (BOWATER ONLY) |
|---|---|---|---|
| ☐ REGISTRY | ☐ GREAT LAKES TRADE | | ☐ OIL SPILL RESPONSE |

PREVIOUS EDITION OBSOLETE                                                                                            NN 7530-00-701-0800

**I. PURPOSE OF APPLICATION:**

[XX] 1. EXCHANGE OF CERTIFICATE OF DOCUMENTATION.

[ ] 2. REPLACEMENT OF LOST, WRONGFULLY WITHHELD OR MUTILATED CERTIFICATE OF DOCUMENTATION

[ ] 3. RETURN TO DOCUMENTATION FOLLOWING DELETION. NAME OF VESSEL WHEN LAST DOCUMENTED:

[ ] 4. APPLICATION FOR OFFICIAL NUMBER AND FIRST CERTIFICATE OF DOCUMENTATION. VESSEL

[ ] WAS BUILT AT _____ IN _____

OR

[ ] IS UNDER CONSTRUCTION AT _____ AND IS SCHEDULED FOR COMPLETION IN _____

HULL MATERIAL: [ ] WOOD [ ] STEEL [ ] FIBROUS REINFORCED PLASTIC [ ] ALUMINUM [ ] CONCRETE
[ ] OTHER (DESCRIBE) _____

APPROXIMATE LENGTH OF VESSEL _____

PREVIOUS NAMES, NUMBERS, OR FOREIGN REGISTRATIONS OF VESSEL _____

**J. CERTIFICATION:**

I (WE) CERTIFY THAT:

(A) I AM (WE ARE) A CITIZEN(S) OF THE UNITED STATES AND LEGALLY AUTHORIZED TO EXECUTE THIS APPLICATION IN THE CAPACITY SHOWN;

(B) THAT THE VESSEL(S) TO WHICH THIS APPLICATION APPLIES:

    (i) [XX] HAS (HAVE) BEEN MARKED
    OR
    [ ] WILL BE MARKED

IN ACCORDANCE WITH THE DIRECTIONS IN THE INSTRUCTION SHEET (CG-1258-A) FOR THIS APPLICATION;

(ii) WILL AT ALL TIMES REMAIN UNDER THE COMMAND OF A U.S. CITIZEN;

(iii) WILL NOT BE OPERATED IN A TRADE NOT AUTHORIZED BY THE ENDORSEMENT(S) ON THE CERTIFICATE(S) OF DOCUMENTATION;

(iv) HAS NOT BEEN REBUILT SINCE LAST DOCUMENTATION

(v) THE VESSEL IS
    [XX] NOT TITLED UNDER A STATE
    OR
    [ ] IS TITLED UNDER THE LAWS OF _____

(C) THE NAME(S) OF THE VESSEL(S) WILL NOT BE CHANGED WITHOUT APPROVAL OF A COAST GUARD DOCUMENTATION OFFICER; AND

(D) I (WE) WILL PROMPTLY NOTIFY THE DOCUMENTATION OFFICER AT THE VESSEL'S PORT OF RECORD OR THE PORT NEAREST THE VESSEL UPON A CHANGE IN ANY OF THE INFORMATION OR REPRESENTATIONS IN THIS APPLICATION.

| PRINTED OR TYPED NAME | SIGNATURE | CAPACITY | (E.G., OWNER, AGENT, TRUSTEE, GENERAL PARTNER, CORPORATE OFFICER) |
|---|---|---|---|
| YOLA PIERRE | | SOLE OWNER | |

DATE: 1-26-95

**PRIVACY ACT STATEMENT**

IN ACCORDANCE WITH 5 U.S.C. 552a, THE FOLLOWING INFORMATION IS PROVIDED TO YOU WHEN SUPPLYING PERSONAL INFORMATION TO THE U.S. COAST GUARD.

1. AUTHORITY. SOLICITATION OF THIS INFORMATION IS AUTHORIZED BY 46 U.S.C., CHAPTERS 121 AND 125; 46 U.S.C. APP. 802 AND 883.

2. THE PRINCIPAL PURPOSES FOR WHICH THIS INFORMATION IS TO BE USED ARE:

(1) TO DETERMINE CITIZENSHIP OF THE OWNER OF THE VESSEL FOR WHICH APPLICATION FOR DOCUMENTATION IS MADE; AND
(2) TO DETERMINE ELIGIBILITY OF THE VESSEL TO BE DOCUMENTED WITH THE TRADE ENDORSEMENT SOUGHT.

3. THE ROUTINE USES WHICH MAY BE MADE OF THIS INFORMATION INCLUDE RELEASE TO LAW ENFORCEMENT OFFICIALS, TO THE GENERAL PUBLIC UNDER FREEDOM OF INFORMATION ACT, AND TO PUBLISH INFORMATION ABOUT U.S. DOCUMENTED VESSELS.

4. DISCLOSURE OF THE INFORMATION REQUESTED ON THIS FORM IS VOLUNTARY. HOWEVER FAILURE TO PROVIDE THE INFORMATION REQUESTED WILL RESULT IN DENIAL OF THE APPLICATION FOR DOCUMENTATION, WHICH MAY PREVENT THE OWNER FROM OPERATING THE VESSEL(S) IN A SPECIFIED TRADE.

THE COAST GUARD ESTIMATES THAT THE AVERAGE BURDEN FOR THIS FORM IS 30 MINUTES. YOU MAY SUBMIT ANY COMMENTS CONCERNING THE ACCURACY OF THIS BURDEN ESTIMATE OR MAKE SUGGESTIONS FOR REDUCING THE BURDEN TO: COMMANDANT (G-MVI), U.S. COAST GUARD, WASHINGTON, DC 20593-0001 OR OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF INFORMATION AND REGULATORY AFFAIRS, ATTENTION: DESK OFFICER FOR DOT/USCG, OLD EXECUTIVE OFFICE BUILDING, WASHINGTON, DC 20503.

*U.S. Government Printing Office: 1992 — 317-673/67944

**EXHIBIT "G"**

**OFFENSE INCIDENT REPORT**

1. Original
2. Supplemental  [7]

MIAMI BEACH POLICE

9.7.1.8.8.7.6

| | | |
|---|---|---|
| 0.5.2.4.9.9 | 0.2.5.3 | 0248 | 0253 | 0400 |

Type: Bln/mp/vrn 5 Other  HON  05/24/99  0230  MON  05/24/99  0253

1  /  BurglAry - Once Vessel  C  8.1.0  02-  1  2306/0601

2

640  DAYTON/A  MIAMI BEACH  33141

Victim of Burglary - Boat

PIERLE, FRANNIK  101 866 9748

640  DAYTON/A  MIA BCH  FL  33141

Victim of Burglary - Boat,

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 6 | M | 1 1 1 7 4 4 | 01 | 01 | C | 0 0 | 00 | |

3 Rem

M

Code  S.01  UNIC

BLACK  Clothing

M

--- THE REPORTS ON THE LISTED DATE AND TIME AN UNKNOWN MALE DRESSED IN

--- BLACK CLOTHING BURGLARIZED THE LISTED BOAT/VESSEL. V-01 REPORTS SEEING THE UNKNOWN

MALE S-01 IN A SMALL BOAT APPROX 12-14 FEET IN LENGTH TIED UP TO HIS DOCK.

01 TURNED ON THE LIGHTS AND WENT OUTSIDE. S01 FLED IN THE BOAT EAST BOUND.

- THE PLEXI-GLASS LOCK ASSEMBLY TO THE CABIN WAS BROKEN AND THE LISTED ITEMS

--- STOLEN. NUMEROUS PAPERS AND EQUIPMENT INSTRUCTION BOOKS WERE FOUND

--- THE WATER, V-01 RETRIEVED FROM S-01 ALSO REMOVED @ PLACE FISHING

1 NCR  1 VPR-  1 PER-

031  A8.1  05/24/99

S9+ .1 Elmoz-0300 PCC





**NARRATIVE CONTINUATION**

MIAMI BEACH POLICE

no. 1 3 0 7 0 0

99 18876

D.52499 Burglary / Pierre

ROD AND REEL COMBOS FROM THE PATIO AT THE REAR OF THE HOUSE. THE RODS WERE ON A RACK WITH MANY OTHERS.

CRIME SCENE // RESPONDED AND PROCESSED THE SCENE

V-01 WAS ADVISED TO INVENTORY HIS BELONGINGS AND RE-CONTACT IF ANY FURTHER ITEMS WERE MISSING.

Ioin Iwen Ivpn Lenn

071                    AB5        05/24/99

SGT V Elmore 0300 RRC

**EXHIBIT "H"**

# SEACOAST MARINE INSURANCE
## 1640  W. OAKLAND PARK BLVD., SUITE 304
## FORT LAUDERDALE  FL  33311
### PHONE:  (954)  730-8595
### FAX:  (954)  730-9533

**DATE:**    05/31/99

**TO:**    Frank Pierre Jr., MD.

**FROM:**    Joel A. Berg, CIC

**RE:**    JBW 812 and JBW 814

---

**NOTES/COMMENTS:**

Dear Dr. Pierre,

We are now directly servicing the policies you have with Richard Sparrow and Company through Maritime Insurance and Chris Cooper.   We have just been advised by Richard Sparrow and Company that they will not be offering renewal terms due to the two claims that you have recently had.   Please be sure to make arrangements to place your coverage for both vessels with with a new insurance carrier as we do not have another insurance  company to rewrite the coverage for both vessels expiring on the 24th of July, 1999.

Please feel free to call if you have any questions.

Kindest Regards,



**PLAINTIFF'S
EXHIBIT**
#16
Kw/p 5 - 11 01

**EXHIBIT "I"**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### IN ADMIRALTY

CASE NO. 00-388-CIV-MOORE

AXA GLOBAL RISKS (UK) LTD.,

    Plaintiff,

vs.

FRANK PIERRE, JR., individually,

       Defendant.
_____/

### AFFIDAVIT OF B. A. USHER

BEFORE ME appeared B.A. USHER who. being first duly sworn, deposes and states as follows:

1.    My name is B.A. Usher and I am the authorized representative of AXA Global Risks (UK) Ltd. who accepted the risk and underwrote the policy herein issued to Frank Pierre, Jr. and, in said capacity, have personal knowledge of the matters set forth below.

2.    In July 1999, I received a Yacht Application for insurance from Frank Pierre. Jr., requesting insurance for his vessel "THE FOUR OF US". In the application, Pierre was asked whether he had been involved in a marine loss in the past 10 years and, further, whether his coverage had been declined, cancelled or non-renewed during the preceding five years.

3.    In the Yacht Application, Pierre stated he did <u>not</u> have a marine loss in the last 10 years and he had <u>not</u> had his coverage declined, cancelled or non-renewed during the last 5 years. Based on the information provided by Frank Pierre, Jr. in his Yacht Application for insurance, I agreed to accept the risk and underwrite coverage for the vessel.

4.    Underwriters' investigation has disclosed, however, that Frank Pierre, Jr. had, in fact,

CASE NO.: 00-388-CIV-MOORE
Page 2

incurred a marine loss in the last 10 years, specifically a marine loss during the preceding policy period, that resulted in litigation against his previous Underwriters and which was never disclosed in his application for the subject policy.

5.  Underwriters' investigation further revealed that Pierre had, in fact, had his insurance non-renewed in the last 5 years, specifically by his preceding Underwriter, which was never disclosed on the application. In addition, Pierre identified himself as the insured, rather than his wife, Yola Pierre, who actually owned the vessel.

6.  As the Underwriter in this instance, I never would have accepted the risk and never would have agreed to underwrite the subject policy had I been informed by Pierre that he had had a prior marine loss (with resulting litigation) against his previous underwriter who subsequently non-renewed his policy. Further, I would not have issued the policy to Pierre for a vessel owned by his wife. These factors are deemed by Underwriters to cause a material increase in the risk and, had they been disclosed, would have caused the undersigned to decline acceptance of the risk.

I HAVE READ THE FOREGOING AND FULLY AGREE WITH ITS CONTENTS. I FURTHER DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF. (Title 28 U.S.C. §746).

B. A. USHER

**EXHIBIT "J"**



1                  UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA

2

3               IN ADMIRALTY

             CASE NO:   00-388-CIV-MOORE

4

5

6

   AXA GLOBAL RISKS (UK) LTD.,          )

7                               )

             Plaintiff/Cross-Defendant,  )

8                               )

   vs.                          )

9                               )

   FRANK PIERRE, JR., Individually,   )

10                              )

             Defendant/Counter-Plaintiff,)

11                              )

   and

12                              )

   YOLA PIERRE, Individually,        )

13                              )

             Counter-Plaintiff.        )

14                              )

   ----------------------------------------)

15

16

17

18                          9100 S. DADELAND BOULEVARD

                        MIAMI, FLORIDA

19                          THURSDAY

                        MAY 24, 2001

20                          2:30 P.M. -3:30 P.M.

21

22                   -  -  -  -  -

23

24                  DEPOSITION OF

25                   DWIGHT DYER

```
 1          Q     And underwriting file is there; any type of
 2    underwriting file maintained by you.
 3          A     This is the file that we maintain.
 4          Q     The whole file?
 5          A     The whole file.
 6          Q     Does Axa Global Risks or the general
 7    managing agent or broker send you any kind of
 8    booklets, leaflets or anything regarding the
 9    marketing of the insurance and how to essentially
10    sale or underwrite it?
11          A     Axa doesn't send anything to me.
12          Q     Does anyone else on their behalf, for
13    example, that dictates that, you know, if a person
14    has had experience with the vessel, when they're
15    qualified for this, or if they have had, you know,
16    claims, then it affects it in this manner, you know,
17    anything essentially guidelines and policies
18    regarding underwriting?
19                Do you get anything like that?
20          A     As far as from who?  You saying Axa?
21          Q     Well, you're placing the coverage and
22    basically through Axa, do you know that at the time?
23          A     If you look at the files here, you can see
24    where the coverage goes from my agency locally here
25    to Insco Marine in New York.  They then place it
```

```
 1        A    No.

 2        Q    Nothing like that?

 3        A    No.  No, I haven't done any.

 4        Q    Now, in this instance regarding the policy

 5   issued to Frank Pierre, was that an insurance policy

 6   which was requested from you by Dr. Pierre?

 7        A    Yes.  Dr. Pierre asked us to cover his

 8   vessel.

 9        Q    As I understand your testimony, Dr. Pierre

10   contacted you?

11        A    Right.

12        Q    And requested or inquired whether you could

13   obtain coverage for his boat; is that correct?

14        A    Correct.

15        Q    Once he made that request, what did you do

16   in response to it?

17        A    Well, we asked him for previous coverage,

18   which was documentation that he brought it to us,

19   which we then Faxed to New York for them to --

20        Q    You're referring to the Maritime Insurance

21   Group --

22        A    Yes.

23        Q    -- document?

24        A    Yes.

25        Q    As well as the Sea Wave yacht contract?
```

```
 1          A     Right, whatever he had.
 2          Q     Why did you Fax these previous insurance
 3   documents to New York?
 4          A     Because I had placed coverage through them.
 5   I'm not direct -- I don't direct.  I'm a local
 6   broker.
 7          Q     Who were you Faxing these documents to in
 8   New York?
 9          A     Insco Marine.
10          Q     How do you know to send these to Insco
11   Marine?
12          A     Because I have a previous relationship with
13   them.
14          Q     As far as procuring this insurance is
15   concerned, have you ever had any contact whatsoever
16   with the underwriting Axa Global Risks?
17          A     No.
18          Q     Is Insco, to your knowledge, a surplus
19   lines agent licensed in Florida?
20          A     I really don't know that.
21          Q     When you Faxed the prior insurance
22   documents to Insco, do you know what they did at that
23   point?
24          A     I really don't know.  I think they
25   submitted it, I would think.
```

```
 1          Q     Where was that medical office?

 2          A     That was on US-1 north.  What would that

 3    be?  I'm not too --

 4          Q     In North Miami?

 5          A     Yes, North Miami.

 6          Q     Was that where Dr. Pierre asked you to meet

 7    him?

 8          A     Yes.

 9          Q     Do you remember who was there when you met

10    with Dr. Pierre?

11          A     Dr. Chin or Chang, a chiropractic, some

12    chiropractic or something.

13          Q     Was anyone present other than Dr. Pierre

14    and Dr. Chin or Chang?

15          A     There was a receptionist.  I went in.

16          Q     Were you alone otherwise?

17          A     Yes.

18          Q     When you arrived, did you present the yacht

19    application to Dr. Pierre?

20          A     Yes.

21          Q     What did you ask him to do when you handed

22    him the application?

23          A     Complete the application.

24          Q     Were you with him when he completed it?

25          A     I was not.  I was sitting outside so --
```

```
 1    force; he was just coming up for renewal.
 2        Q    Did he ever advise you that the policy he
 3    had provided to you had been nonrenewed?
 4        A    No, I didn't know it was non-renewed.
 5        Q    One, the application was completed and
 6    signed by Dr. Pierre, to whom did you send it?
 7        A    Insco.
 8        Q    Do you know what Insco did with the
 9    application?
10        A    I wasn't physically there, so probably
11    Faxed off to wherever it's supposed to go.
12        Q    Was there anyone in particular at Insco
13    that you dealt with?
14        A    At that time could have been any number of
15    girls who handled the paperwork.
16        Q    Was there any one person who was your
17    contact there?
18        A    No.  I spoke to everyone in the office.
19        Q    Whoever answered the phone?
20        A    Yes.  I was known there.  You know, when I
21    was in New York, I had association with Insco, too.
22        Q    After submitting the application to Insco,
23    what was the next communication you received
24    regarding this request for coverage?
25        A    Just the your premiums, you know, to find
```

```
 1          A     Right.

 2          Q     And, again, you're referring to a quote

 3    dated June 29, 1999 from Richards -- from TL Dalias?

 4          A     Right.  They forward it onto me.

 5          Q     At any time from the first time you were

 6    contacted by Dr. Pierre, until today, have you ever

 7    spoken with anybody other than someone at Insco?

 8          A     Never.

 9          Q     And doctor Pierre, obviously?

10          A     Dr. Pierre, Insco.  I just spoke to them.

11          Q     Did you ever deal with anyone at TL Dalias?

12          A     No.

13          Q     Have you ever spoken to anyone at TL

14    Dalias?

15          A     No.

16          Q     Did you ever deal with respect to this

17    policy with anyone at Axa Global Risks (UK)?

18          A     No.

19          Q     Do you know anyone at that underwriter?

20          A     No.

21          Q     Do you have as the owner, and I guess,

22    president of Dyer Marine Property, do you have any

23    authority to bind coverage on behalf of any

24    underwriters?

25          A     No.  I go through -- I go through a second
```

```
 1    party to deal with London market, which is Insco.
 2         Q    Would it be fair to say, Mr. Dyer, that
 3    your role is to request coverage?
 4         A    Yes, I am basically a local broker who
 5    sends my business out and gets a quote and
 6    basically--
 7         Q    In this instance your role would have been
 8    to obtain insurance at Dr. Pierre's request; is that
 9    right?
10         A    Yes.   Uh-huh.
11         Q    You have to say, "Yes," or, "No."   I'm
12    sorry.
13         A    Yes.
14         Q    On the notice of taking your deposition
15    today, it references your name Gary Dyer, and then it
16    says, underwriter, Gary Dyer.
17                   You're not a --
18         A    No, I'm not an underwriter.
19         Q    Underwriter, are you --
20         A    No.
21         Q    You don't have any underwriting authority?
22         A    No.   Nothing.
23         Q    Would it be fair to say in this instance
24    you were acting solely on behalf of Frank Pierre,
25    Jr.?
```

```
 1           A     I submit business based on clients that
 2     came to my office, yes.
 3           Q     No.   I understand, and my question is based
 4     on that.
 5                       Would you agree with me that your role
 6     in this instance was solely to act on behalf of
 7     Dr. Pierre?
 8           A     Yes, provide coverage.
 9           Q     I think you may have been asked this
10     earlier by Mr. Gardana, but do you know, as you sit
11     here today, whose handwriting is on the yacht
12     application?
13           A     The person that filled it out, as far as I
14     know, I gave it to Dr. Pierre.  I don't know.
15           Q     Do you know who filled it out?
16           A     I gave it to him, so I don't know.
17           Q     In other words, you don't know?
18           A     I mean, you're asking me was I -- I was not
19     in the room with him when he filled it out.
20           Q     I understand.
21                       I am just asking if you know who
22     actually wrote in the information on the application?
23           A     As far as I am concerned, Dr. Pierre I gave
24     it, so I would think he filled it out.
25           Q     But, when you handed him the application,
```

```
 1          Q      "They," being Insco?

 2          A      Insco.

 3          Q      Was the policy until this instance

 4   forwarded to you or directly to Dr. Pierre?

 5          A      The policy, I delivered to Dr. Pierre.

 6          Q      Who sent the policy to you?

 7          A      Insco.

 8          Q      Insco?

 9          A      Uh-huh.

10          Q      Finally, in your file, you have a voided

11   check from Pierre and Associates.

12                 Can you explain to us what that

13   represents?

14          A      He wrote us a check for a payment, partial

15   payment on the premium, and then he cancelled it out,

16   and then we had to go and get some financing for it.

17                 That's how this particular check was

18   just laying around.  I just put it in there because

19   he voided it out and put it in there.

20          Q      So, ultimately, then, this policy was -- or

21   a premium for the policy was financed?

22          A      Yes.  Some of it, he financed it.

23          Q      Did he do that through your office, or did

24   he arrange it directly himself?

25          A      No, I used one of the facilities that we
```